IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| TAMARA LYNN SWINK, | ) | |
| | ) | Case No. 19-51012 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| TAMARA LYNN SWINK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| FEDERAL NATIONAL MORTGAGE | ) | Adv. Proceeding No. 20- |
| ASSOCIATION, SETERUS, INC., and | ) | |
| NATIONSTAR MORTGAGE, LLC d/b/a | ) | |
| MR. COOPER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## VERIFIED COMPLAINT

Now comes the Plaintiff, Tamara Lynn Swink, (the "Plaintiff"), complaining of the acts of the Defendants, and respectfully alleges as follows:

## I.    INTRODUCTION

1.    This is an action for actual and punitive damages, including attorney's fees, filed by the Plaintiff for failure of the Defendants to comply with applicable provisions of Titles 11 and 15 of the United States Code.

2.    In addition, or in the alternative, this action is also filed for actual and punitive damages, including statutory damages and attorney's fees, filed by the Plaintiff for the failure of Defendants to comply with applicable North Carolina law, and/or for the failure of the Defendants to comply with other non-bankruptcy federal law.

3.    This action is further filed to preclude the frustration of the underlying purposes of the United States Bankruptcy Code.

4.    This action is also brought by a consumer for Defendants' violation of the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* ("TILA") and the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA"), and their implementing regulations.

1

5.      The Consumer Financial Protection Bureau ("CFPB") is the primary regulatory agency authorized by Congress to supervise and enforce compliance of TILA and RESPA.  The CFPB periodically issues and amends mortgage servicing rules under Regulation X, 12 C.F.R. Part 1024, and Regulation Z, 12 C.F.R. Part 1026, RESPA and TILA's respective implementing regulations.

6.      Specifically, Plaintiff seeks remedies as provided in TILA and RESPA for Defendants' failure to comply with Section 1639(g) of TILA, Section 2605(k) of RESPA, 1024.36 of Regulation X, and 1026.36 of Regulation Z.

## II.      JURISDICTION

7.      This is a core proceeding as defined by 28 U.S.C. § 157(b)(2) in that it concerns claims and matters arising out of the administration of this bankruptcy case and rights duly established under Title 11 of the United States Code, and/or other applicable federal law.  To the extent the court may find this to be a non-core proceeding, the Plaintiff consents to entry of a final order in this matter by the Bankruptcy Court, in accordance with 28 U.S.C. § 157(c)(2).

8.      This Court has jurisdiction on proceedings that are not core proceedings but that relate to a case under title 11.  28 U.S.C. § 157(c)(1).

9.      This Court has "related to" jurisdiction to determine Plaintiff's cause of action under the Fair Debt Collection Practices Act ("FDCPA").

10.     This Court has jurisdiction to enter a final and dispositive order in this matter under the decision in *Budget Service Co. v. Better Homes of Virginia*, 804 F.2d 289 (4th Cir. 1986).

11.     This Court has personal and subject matter jurisdiction to hear matters herein pursuant to 28 U.S.C. §§ 157(b)(2) and 1334 and pursuant to Local Rule 82.11 of the United States District Court for the Middle District of North Carolina in accordance with the Bankruptcy Amendments and Federal Judgeship Act of 1984.

12.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §§ 157(c)(1), 157(c)(2), and 157(d).

13.     Venue is proper pursuant to 28 U.S.C. § 1409.

## III.     PARTIES and BACKGROUND INFORMATION

### A.      Plaintiff

14.     The Plaintiff is a resident of Stanly County, North Carolina.

15.     Plaintiff purchased property known as 124 North Cotton Avenue, Albemarle, North Carolina (the "Property") on October 9, 2006.  A copy of the deed to Plaintiff (the "Deed") is attached hereto and incorporated herein as "Exhibit A."

16.     Plaintiff executed a promissory note dated September 29, 2006 between the Plaintiff and First Franklin a division of National City Bank (the "Note") in the original amount

2

of $59,600.00 and an interest rate of 11.4%. A copy of the Note is attached hereto and incorporated herein as "Exhibit B."

17. The Note signed by Plaintiff is a consumer credit transaction within the meaning of, and subject to, TILA.

18. The Note was secured by a Deed of Trust on the Property (the "Deed of Trust") that was recorded on October 9, 2006 in the office of the Register of Deeds of Stanly County, North Carolina, in Deed Book 1144, Page 0777. A copy of the Deed of Trust is attached hereto and incorporated herein as "Exhibit C."

19. The Note, Deed of Trust, and any subsequent transfers and modifications thereof will be collectively referred to as the "Mortgage," "Loan," and/or the "Mortgage Loan."

20. The Note signed by Plaintiff in connection with the Mortgage is a consumer credit transaction within the meaning of, and subject to, TILA.

21. On January 24, 2007, Plaintiff transferred an undivided half interest in the Property to herself and her mother, Lois Elaine McLeod ("Mother"). A copy of the deed from Plaintiff to Mother (the "Second Deed") is attached hereto and incorporated herein as "Exhibit D."

22. Mother has continuously resided in the Property since its purchase by Plaintiff in 2006. Plaintiff lived in the Property with Mother from 2006 until 2008 and then again beginning in January of 2020.

23. Currently, Plaintiff, Mother, and Plaintiff's fifteen (15) year-old daughter reside in the Property.

24. Plaintiff is the Debtor in the above-captioned bankruptcy proceeding filed under Chapter 13 of the United States Bankruptcy Code on or about September 27, 2019 (the "Petition Date") (the "Current Case").

25. Plaintiff is a "debtor" as defined by the Bankruptcy Code, 11 U.S.C. § 101(13).

26. Plaintiff's residence is a residential structure containing one to four family housing units.

27. The Mortgage loan in question is a "residential mortgage transaction" as defined in 15 U.S.C. § 1602(x).

28. The Mortgage is a "federally related mortgage loan" as defined in 12 U.S.C. § 2602(1) and 12 C.F.R. Part 1024.2(b).

29. The Mortgage is a "debt" as defined by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692(a)(5).

30. Plaintiff is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692(a)(3).

B.      **Defendants**

1.      **Fannie Mae**

31.      Upon information and belief, Defendant Fannie Mae is a United States government-sponsored enterprise with its principal office address of 3900 Wisconsin Avenue, NW, Washington, DC, 20016.

32.      Fannie Mae is the leading source of financing for mortgage lenders in the United States.[1]

33.      Fannie Mae is authorized by Congress to provide a secondary market for residential mortgages.

34.      Fannie Mae is the owner and holder of the Mortgage pursuant to a Transfer and Assignment of the Deed of Trust to Fannie Mae dated December 12, 2016 and recorded in the Office of the Register of Deeds of Stanly County in Deed Book 1589, Page 830.  A copy of the Transfer and Assignment (the "Assignment") is attached hereto and incorporated herein as "Exhibit E."

35.      Fannie Mae is a creditor of the Plaintiff as defined in 15 U.S.C. § 1602(g).

36.      Fannie Mae, itself and through its agents, engaged and engages in the collection of debts from North Carolina consumers using the mail and telephone.

37.      Fannie Mae's employees, affiliates, directors, agents and attorneys act under the direction and supervision of Fannie Mae and, therefore, Fannie Mae is directly and/or vicariously liable for the actions of its employees, affiliates, directors, agents and attorney under, *inter alia,* the theory of *respondeat superior*.

38.      Fannie Mae was a voluntary assignee of the Mortgage pursuant to 15 U.S.C. § 1641.

39.      Fannie Mae is the master servicer of the Mortgage.

40.      Any servicer of a Fannie Mae mortgage loan must abide by the Fannie Mae Servicing Guide (the "Servicing Guide").  A copy of select portions of the Servicing Guide is attached hereto and incorporated herein as "Exhibit F."  The full servicing guide is available at https://singlefamily.fanniemae.com/media/document/pdf/servicing-guide-october-14-2020.

41.      Fannie Mae is a principal of Seterus, Inc.

42.      Fannie Mae is a principal of Nationstar Mortgage d/b/a Mr. Cooper.

2.      **Seterus, Inc.**

43.      Defendant Seterus, Inc. ("Seterus") is a corporation organized under the laws of the State of Delaware with its principal office in Research Triangle Park, North Carolina.

---

[1] *See What We Do*, Fannie Mae, https://www.fanniemae.com/about-us/what-we-do (last visited Dec. 9, 2020).

44.     Seterus is a mortgage loan servicer as the term is defined in 12 U.S.C. § 2605(i)(2) and 12 C.F.R. Part 1024.2(b).

45.     Upon information and belief, Seterus serviced the Mortgage loan obligation owned by Fannie Mae and secured by a mortgage upon Plaintiff's residence prior to the date of the Assignment through March 7, 2019.

46.     Upon information and belief, when Seterus became servicer of the Mortgage, the Mortgage was in default.

47.     Defendant Seterus, itself, and through its agents, engaged in the collection of debts from North Carolina consumers using the mail and telephone and regularly attempts to collect consumer debts alleged to be due to another.

48.     Its employees, affiliates, directors, agents and attorneys act under the direction and supervision of Seterus and, therefore, Seterus is directly and/or vicariously liable for the actions of its employees, affiliates, directors, agents and attorney under, *inter alia,* the theory of *respondeat superior*.

49.     Defendant Seterus regularly attempts to collect consumer debts alleged to be due to another and holds a collection agency permit from the North Carolina Department of Insurance, in line with N.C.G.S. § 58-70-1.

50.     Seterus is a "collection agency" as defined by the North Carolina Collection Agency Act of N.C.G.S. § 58-70-15.

51.     Seterus is a "debt collector" as defined by North Carolina Debt Collection Act of N.C.G.S. § 75-50.

52.     While servicing the Mortgage on behalf of Fannie Mae, Seterus had to abide by the terms of the Servicing Guide.

53.     Seterus is an agent of Fannie Mae.

### 3.     Nationstar Mortgage LLC d/b/a Mr. Cooper

54.     Defendant Nationstar Mortgage LLC d/b/a Mr. Cooper ("Mr. Cooper") is a mortgage servicer and corporation organized under the laws of the State of Texas, with its principal office located in Dallas, Texas.

55.     Mr. Cooper is a mortgage loan servicer as the term is defined in 12 U.S.C. § 2605(i)(2) and 12 C.F.R. Part 1024.2(b).

56.     The Mortgage loan was transferred by Seterus to Mr. Cooper on March 1, 2019.

57.     Mr. Cooper began servicing the Mortgage on March 1, 2019.

58.     Defendant Mr. Cooper regularly attempts to collect consumer debts alleged to be due to another and holds a collection agency permit from the North Carolina Department of Insurance, in line with N.C.G.S. § 58-70-1.

59.     Mr. Cooper is a "collection agency" as defined by the North Carolina Collection Agency Act of N.C.G.S. § 58-70-15.

60.     Mr. Cooper is a "debt collector" as defined by North Carolina Debt Collection Act of N.C.G.S. § 75-50.

61.     Defendant Mr. Cooper, itself, and through its agents, engaged and engages in the collection of debts from North Carolina consumers using the mail and telephone.

62.     Mr. Cooper's employees, affiliates, directors, agents and attorneys act under the direction and supervision of Mr. Cooper and, therefore, Mr. Cooper is directly and/or vicariously liable for the actions of its employees, affiliates, directors, agents and attorney under, *inter alia,* the theory of *respondeat superior*.

63.     Mr. Cooper acts as a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6), including with regard to the Mortgage.

64.     While servicing the Mortgage, Mr. Cooper must abide by the terms of the Servicing Guide.

65.     Mr. Cooper is an agent of Fannie Mae.

## IV.     FACTS

### A.     Mortgage Documents

#### 1.     Loan Modification Agreement

66.     On August 13, 2009, Plaintiff and First Franklin entered into a Loan Modification Agreement (the "Loan Modification") that amended and supplemented the Mortgage and Deed of Trust.  A copy of the Loan Modification is attached hereto and incorporated herein as "Exhibit G."

67.     The Loan Modification was in the amount of $65,082.23 with a term of 480 months.

68.     The Loan Modification had an interest rate of 2.00% for the first two years, 2.375% in year three, 3.375% in year four, 4.375% in year five, and 5.375% for years six through forty.

69.     Paragraph 6 of the Loan Modification provides the following:

a.     Lender may assess a late charge for overdue payments if a payment is not received by the end of the fifteenth calendar day after the date it is due;

b.     That default means that borrower did not pay the full amount of each monthly payment on the date it was due; and

c.     That lender has the right to be paid back by borrower all of its costs and expenses in enforcing the Note if the borrower is in default.

## 2.     Deed of Trust

70.     Paragraph (M) of the Deed of Trust defined "escrow items" as "those items that are described in Section 3."

71.     Paragraph (Q) of the Deed of Trust defined "RESPA" as the "Real Estate Procedures Act (12 U.S.C. § 2601 et seq.) and its implementing regulation, Regulation X . . . ." "As used in this Security Instrument, 'RESPA' refers to all requirements and restrictions that are imposed in regard to a 'federally related mortgage loan' even if the Loan does not qualify as a 'federally related mortgage loan' under RESPA."

72.     The Deed of Trust contains Uniform Covenants that Borrower and Lender must agree to and follow.

a.     Some pertinent sections of the UNIFORM COVENANTS section are as follows:

1.     Uniform Covenant 1

**Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges**.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.

2.     Uniform Covenant 2 titled "Application of Payments or Proceeds" describes how payments will be applied by the Lender.

3.     Uniform Covenant 3

 **Funds for Escrow Items**.  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; . . . (c) premiums for any and all insurance required by Lender under Section 5. . . These items are called "Escrow Items."

If Borrower is obligated to pay Escrow Items directly, pursuant to a [written] waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount Borrower shall then be obligated under Section 9 to repay to Lender any such amount.

4.     Uniform Covenant 5 reads in part as follows:

**Property Insurance**.  If Borrower fails to maintain any of the coverages described [in

the above paragraph], Lender may obtain insurance coverage, at Lender's option and Borrower's expense.

5.      Uniform Covenant 14 reads in part as follows:

**Loan Charges**.  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.

## B.      The Prior Bankruptcy Case

73.      Plaintiff filed a Chapter 13 proceeding in the Middle District of North Carolina on November 14, 2013, case number 13-51412 (the "Prior Case").

74.      Plaintiff listed her ownership interest in the Property on Schedule A and the Mortgage debt to Fannie Mae's predecessor, Residential Credit Slt ("Residential") on Schedule D.

75.      Plaintiff proposed a Chapter 13 Plan (the "Plan") that provided that her Mother/co-owner would continue to pay the payments due on the Mortgage during the pendency of the proceeding directly to Residential.

76.      The Plan was confirmed on February 6, 2014 without objection by Residential.  A copy of the Order Confirming Plan in the Prior Case is attached hereto and incorporated herein as "Exhibit H."

77.      Attorney Matthew Underwood, as counsel with the law firm of Brock & Scott, filed a Notice of Appearance on behalf of Fannie Mae on March 23, 2015.  [Doc. No. 24].  A copy of the Notice of Appearance is attached hereto and incorporated herein as "Exhibit I."

78.      On November 7, 2016, Fannie Mae filed a proof of claim in the Prior Case, claim number 10-1, listing Seterus as the servicer of the Mortgage, a balance due of $59,533.95, an interest rate of 5.375%, and no amount being in default (the "Prior Case Proof of Claim").  A copy of the Prior Case Proof of Claim is attached hereto and incorporated herein as "Exhibit J."

79.      On March 11, 2016, this Court entered an Amended Standing Order that is incorporated into all confirmed chapter 13 plans in this district (the "Amended Standing Order").  A copy of the Amended Standing Order is attached hereto and incorporated herein as "Exhibit K."

80.      Paragraph B(7) of the Amended Standing Order provides for debtor's that receive a discharge in their case, "all prepetition and post-petition defaults have been cured and the account is current and reinstated on the original payment schedule under the note and security statement as if no default had ever occurred."

81.      Paragraph B(8) of the Amended Standing Order reads as follows:

**PENALTY FOR FAILURE OF HOLDER TO COMPLY WITH THE REQUIREMENTS OUTLINED UNDER FRBP 3002.1 AND THIS**

8

**STANDING ORDER.** Without limitation to the Court's authority to afford other relief, any willful failure of the Holder to credit payments in the manner required by Rule 3002.1 of the Federal Rules of Bankruptcy Procedure and this Standing Order or any act by the creditor following the entry of discharge to charge or collect any amount incurred or assessed prior to the filing of the Chapter 13 Petition or during the pendency of the Chapter 13 case that was not authorized by the order confirming plan or approved by the Court after proper notice shall constitute contempt of court and shall further be a violation of 11 U.S.C. § 524(i) and the injunction under 11 U.S.C. § 524(a)(2).

### 1.    First Motion for Relief from Stay

82.    On September 11, 2017, counsel for Fannie Mae filed a Motion for Relief from the Automatic Stay (the "First Motion for Relief from Stay") as to the Property. [Doc. No. 43]. A copy of the First Motion for Relief from Stay is attached hereto and incorporated herein as "Exhibit L."

83.    The First Motion for Relief from Stay alleged that the current balance was $60,881.68 and that eight (8) monthly payments on the Mortgage had not been paid, from January 1, 2017 through August 1, 2017. The total arrearage figure was $3,041.48.

84.    Plaintiff's attorney filed an Objection to the First Motion for Relief from Stay on September 19, 2017 alleging that payments on the Mortgage were current. [Doc. No. 46].

85.    According to the loan payment history, payments on the Mortgage were current as of December 31, 2016, and Plaintiff had an overpayment of $133.82 as of January 1, 2017. A loan payment history for May 1, 2016 through September 27, 2019 (the "Payment History") is attached hereto and incorporated herein by reference as "Exhibit M."

86.    Pursuant to the Payment History, payments were made on the Mortgage by Plaintiff[2] between January 1, 2017 and August 1, 2017 as follows:

| Date Due | Amount Due | Date Paid | Amount Paid | Payments ahead/behind |
|---|---|---|---|---|
| 1/1/17 | $400.38 | 1/2/17 | $500.00 | +233.44[3] |
| 2/1/17 | $400.01 | 2/13/17 | $700.00 | +533.43 |
| 3/1/17 | $400.01 |  | $0.00 | +133.42 |
| 4/1/17 | $400.01 | 4/11/17 | $500.00 | +233.41 |
| 5/1/17 | $400.01 |  | $0.00 | -$166.60 |
| 6/1/17 | $400.01 |  | $0.00 | -$566.61 |
| 7/1/17 | $400.01 | 7/10/17<br>7/11/17 | $500.00<br>$400.01 | +$333.40 |
| 8/1/17 | $400.01 |  | $0.00 | -$66.61 |

---

[2] Or co-owner.

[3] +233.44 denotes that Plaintiff was ahead of the contractually due Mortgage payments as of said month in the amount of $233.44.

87.     On October 10, 2017, counsel for Fannie Mae filed a Withdrawal of the First Motion for Relief from Stay that stated "loan has been brought post-petition current." [Doc. No. 52]. A copy of the Withdrawal of the First Motion for Relief from Stay is attached hereto and incorporated herein as "Exhibit N."

88.     By Fannie Mae's own admission, the Mortgage was current as of October 10, 2017.

89.     Seterus assessed a $15.00 property inspection fee to the Mortgage on September 28, 2017.

90.     Seterus assessed a $15.00 property inspection fee to the Mortgage on October 5, 2017.

91.     Payments on the Mortgage starting November 1, 2017 were as follows:

| Date Due | Amount Due | Date Paid | Amount Paid | Payments ahead/behind | Property Inspection Fee Assessed |
|---|---|---|---|---|---|
| 11/1/17 | $400.01 | 11/6/17 | $401.01 | +$450.00 | $15.00 |
|  |  | 11/7/17 | $450.00 |  |  |
| 12/1/17 | $400.01 | 12/5/17 | $400.01 | +$450.00 | $15.00 |
| 1/1/18 | $400.01 |  | $0.00 | +$49.99 | $15.00 |
| 2/1/18 | $406.30 | 2/5/18 | $800.02 | +$443.71 | $15.00 |
| 3/1/18 | $406.30 |  | $0.00 | +$37.41 | $15.00 |
| 4/1/18 | $406.30 | 4/6/18 | $400.01 | +$437.42 | $15.00 |
| 5/1/18 | $406.30 |  | $0.00 | +$31.12 | $15.00 |
| 6/1/18 | $406.30 | 6/5/18 | $400.01 | +$24.83 | $15.00 |
| 7/1/18 | $406.30 | 7/25/18 | $500.01 | +$118.54 | $15.00 |

## 2.     Second Motion for Relief from Stay

92.     Fannie Mae filed another Motion for Relief from the Automatic Stay on July 13, 2018 alleging a balance of $60,925.88 and payment default of four monthly payments, April through July 2018, totaling $1,625.20 (the "Second Motion for Relief from Stay"). [Doc. No. 54]. A copy of the Second Motion for Relief from Stay is attached hereto and incorporated herein as "Exhibit O."

93.     On September 4, 2018, Fannie Mae filed another Withdrawal of Motion for Relief from Stay, which stated that the "loan has been brought post-petition current through August 2018." [Doc. No. 60]. A copy of the Withdrawal of the Second Motion for Relief from Stay is attached hereto and incorporated herein as "Exhibit P."

94.     By Fannie Mae's own admission, the Mortgage was current as of August 31, 2018.

10

95.    Property inspection fees of $15.00 per month were assessed to the Mortgage for the months of August, September, and October 2018.

96.    On October 1, 2018, a legal fee in the amount of $181.00 was assessed to the Mortgage.

97.    Plaintiff successfully completed her Plan, and an Order Discharging Debtor was entered in the Prior Case on February 6, 2019.  [Doc. No. 83].  A copy of the Discharge Order is attached hereto and incorporated herein as "Exhibit Q."

98.    For purposes herein, the First Motion for Relief from Stay and Second Motion for Relief from Stay will be referred to collectively as the "Motions for Relief from Stay."

### B.    Mortgage Payments by Debtor after August 31, 2018

99.    Beginning with the September 2018 Mortgage payment, Plaintiff granted Defendant Seterus authorization to draft the monthly mortgage payment directly from her bank account at Woodforest National Bank ("AutoPay") (the "AutoPay Agreement").

100.    The contractual monthly payment amount due on the Mortgage for the period of February 1, 2018 through January 31, 2019 was $406.30.

101.    On September 5, 2018, Defendant Seterus drafted $407.00 from Plaintiff's bank account.

102.    On September 7, 2018, Defendant Seterus sent Plaintiff a letter stating that it drafted the payment on September 5, 2018 (the "September Payment Letter").  A copy of the September Payment Letter is attached hereto and incorporated herein as "Exhibit R."

103.    The Loan History showed that Defendant Seterus credited the payment to Plaintiff's Mortgage on September 6, 2018.  [Claim No. 5].

104.    Even though the payments on the Mortgage were current, Defendant Seterus assessed a property inspection fee of $15.00 to the account on September 28, 2018.

105.    On October 5, 2018, Defendant Seterus drafted $407.00 from Plaintiff's bank account.

106.    On October 9, 2018, Defendant Seterus sent Plaintiff a letter stating that it drafted the payment on October 5, 2018 (the "October Payment Letter").  A copy of the October Payment Letter is attached hereto and incorporated herein as "Exhibit S."

107.    The Loan History showed that Defendant Seterus credited the payment to Plaintiff's Mortgage on October 5, 2018.

108.    On November 5, 2018, Defendant Seterus drafted $410.00 from Plaintiff's bank account.

109. On November 7, 2018, Defendant Seterus sent Plaintiff a letter stating that it drafted the payment on November 5, 2018 (the "November Payment Letter"). A copy of the November Payment Letter is attached hereto and incorporated herein as "Exhibit T."

110. The Loan History showed that Defendant Seterus credited the payment to Plaintiff's Mortgage on November 7, 2018. [Claim No. 5].

111. On December 3, 2018, Defendant Seterus drafted $410.00 from Plaintiff's bank account.

112. On December 5, 2018, Defendant Seterus sent Plaintiff a letter stating that it drafted the payment on December 3, 2018 (the "December Payment Letter"). A copy of the December Payment Letter is attached hereto and incorporated herein as "Exhibit U."

113. The Loan History showed that Defendant Seterus credited the payment to Plaintiff's Mortgage on December 4, 2018 but reversed the same on December 7, 2018.

114. On January 8, 2019, Defendant Seterus drafted $450.00 from Plaintiff's bank account.

115. On January 10, 2019, Defendant Seterus sent Plaintiff a letter stating that it drafted the payment on January 8, 2019 (the "January Payment Letter"). A copy of the January Payment Letter is attached hereto and incorporated herein as "Exhibit V."

116. The Loan History showed that Defendant Seterus credited the payment to Plaintiff's Mortgage on January 9, 2019.

117. In February of 2019, the monthly contractual payment due on the Mortgage changed to $432.39.

118. On February 5, 2019, Defendant Seterus drafted $550.00 from Plaintiff's bank account.

119. On February 7, 2019, Defendant Seterus sent Plaintiff a letter stating that it drafted the payment on February 5, 2019 (the "February Payment Letter"). A copy of the February Payment Letter is attached hereto and incorporated herein as "Exhibit W."

120. The Loan History showed that Defendant Seterus credited the payment to Plaintiff's Mortgage on February 6, 2019 (the "February Payment") but reversed the same on February 12, 2019. [Claim No. 5].

121. The February Payment was not refunded to Plaintiff's bank account.

**C.      Mr. Cooper Becomes Servicer of Mortgage**

122. On February 11, 2019, Seterus sent Plaintiff a Notice of Servicing Transfer that informed her that on March 1, 2019, Mr. Cooper would begin servicing the Mortgage (the "Notice of Servicing Transfer"). A copy of the Notice of Servicing Transfer is attached hereto and incorporated herein as "Exhibit X."

12

123.    On March 1, 2019, the Mortgage payments would have been current or in insignificant default if correctly applied by Seterus.

124.    On March 1, 2019, the Payment History indicated the Mortgage was in default.

125.    Mr. Cooper believed the Mortgage was in default when it became its servicer.

126.    The Notice of Servicing Transfer further stated that for debtors that were set up through AutoPay with Seterus, the same would continue with Mr. Cooper.

127.    Plaintiff was enrolled in AutoPay with Seterus.

128.    The Notice of Servicing Transfer further provided that for the March 2019 automatic payment, the automatic payment deduction by Mr. Cooper could be delayed up to ten (10) business days but that a late fee would not be assessed nor would the payment be reported as late to the credit bureaus.

129.    Mr. Cooper did not automatically deduct Plaintiff's Mortgage payment in March 2019.

130.    On March 13, 2019, Mr. Cooper sent Plaintiff its "Welcome Letter."  A copy of the Welcome Letter is attached hereto and incorporated herein as "Exhibit Y."

131.    Page two (2) of the Welcome Letter has a section called "Important Payment Information," which contains the following provisions in part:

•       Please be advised that if your account is delinquent or if there are fees and charges due, your account may not be paid ahead nor may principal reduction payments be applied.  When Mr. Cooper receives a remittance that is in excess of a payment amount, that excess is applied to your account. . .

•       Any lump sums received. . . will be applied according to our standard payment application rules.

132.    On page three (3) of the Welcome Letter, under "Escrow Account" it stated "our records indicate that the account has an escrow account for taxes and/or insurance.  The mortgage payment amount includes the tax and/or insurance escrow payment."

133.    Under "Account Status" it read: "our records indicate that the loan is currently in Active Bankruptcy status.  If this information is incorrect, please contact us immediately. . ."

134.    On March 13, 2019, Mr. Cooper believed that the Prior Case was still pending.

135.    Mr. Cooper assessed a $75.00 fee to the Mortgage loan on March 20, 2019 for an "FC Fee."  Upon information and belief, the "FC" stands for "foreclosure."

136.    On March 20, 2019, Mr. Cooper sent Plaintiff a letter alleging that the loan was past due for July 1, 2018 payment and all subsequent payments (the "Default Letter").  The Default Letter alleged that $4,021.05 must be paid by Plaintiff in order to cure the default.  A copy of the Default Letter is attached hereto and incorporated herein as "Exhibit Z."

13

137. Upon information and belief, Mr. Cooper still noted the Plaintiff's account was in Active Bankruptcy status when it sent the Default Letter.

138. The Default Letter contained the following erroneous and/or misleading assertions:

a. "Your loan is currently past due for the 07/01/2018 payment and is due for all payments from and including that date."

b. "The failure to make these payments is a default under the terms and conditions of the mortgage loan."

c. "As of the date of this letter, total monthly payments. . .[ ] are due in the amount of $4,021.05. . ."

d. "TOTAL YOU MUST PAY TO CURE DEFAULT:  $4,021.05."

e. "In order to cure this default, you must pay the total amount due of $4,021.05 in addition to any other amounts that become due from the date of this letter through the date you pay."

f. "$4,021.05 must be paid by 05/04/2019 in order to cure the default."

g. "Failure to pay $4,021.05 by 05/04/2019. . . may result in acceleration of the sums secured by the Security Instrument, foreclosure proceedings and sale of the property."

h. "You may have options available to you to help you avoid foreclosure."

i. "You may contact the State Home Foreclosure Prevention Project of the North Carolina Housing Financing Agency."

139. Plaintiff immediately called Mr. Cooper to inform it that her payments were current through February 2019 and that she was on AutoPay.

140. During the same phone call, Plaintiff requested that Mr. Cooper draft the March 2019 mortgage payment from her bank account per her participation in AutoPay.

141. Mr. Cooper refused to automatically draft the March 2019 payment from the linked AutoPay account and informed Plaintiff that she would have to pay the full alleged default amount.

142. Mr. Cooper stated to Plaintiff that it would accept payment in the amount of the total default but would not accept payments in an amount less than the same.

143. The Notice of Servicing Transfer further stated that the AutoPay schedule should return to normal in the month of April 2019.

144. Mr. Cooper did not automatically deduct Plaintiff's Mortgage payment in April 2019.

145. Despite repeated Requests for Information from the Plaintiff, Mr. Cooper failed to produce a copy of the AutoPay agreement between Plaintiff and Seterus.

**D.      Fees Assessed on the Mortgage by Mr. Cooper**

146. The following fees were assessed by Mr. Cooper pre-petition:

14

| | | |
|---|---|---|
| 03/20/2019 | $75.00 | FC Fee |
| 04/15/2019 | $12.00 | Property Inspection |
| 04/16/2019 | $12.76 | Late Charges |
| 04/24/2019 | $14.00 | Property Inspection |
| 05/20/2019 | $300.00 | Filing Costs |
| 05/20/2019 | $60.00 | Sheriff Costs |
| 05/21/2019 | $937.50 | FC Fee |
| 05/26/2019 | $11.20 | Certified Mail |
| 06/06/2019 | $225.00 | Title Examinte [sic] |
| 06/20/2019 | $14.00 | Property Inspection |
| 07/10/2019 | $693.75 | FC Fee |
| 07/24/2019 | $14.00 | Property Inspection |
| 07/31/2019 | $450.00 | Publication |
| 08/20/2019 | $14.00 | Property Inspection |

### E.       Mr. Cooper Files Foreclosure Proceeding

147.    On May 14, 2019, Defendant Mr. Cooper referred the Property to foreclosure.

148.    On May 15, 2019, Hutchens Law Firm ("Hutchens"), as attorney for Mr. Cooper, sent the Plaintiff a demand for $61,992.22 as the amount due on the Mortgage (the "Pre-Foreclosure Letter").  A copy of the Pre-Foreclosure Letter is attached hereto and incorporated herein as "Exhibit AA."

149.    The Pre-Foreclosure Letter alleged a principal balance of $57,885.34, accrued interest of $2,966.57, escrow advances of $576.46, and a corporate advance balance of $563.85.

150.    On or about May 21, 2019, Mr. Cooper filed foreclosure case number 19SP71 in Stanly County, North Carolina (the "Foreclosure") seeking to foreclose on the Property.

151.    A hearing was scheduled in the Foreclosure for July 10, 2019.  The Notice of Hearing Prior to Foreclosure of Deed of Trust (the "Notice of Hearing") is attached hereto and incorporated herein as "Exhibit BB."

152.    The Notice of Hearing stated that Mr. Cooper was the current holder of the Deed of Trust.

153.    Upon information and belief, Fannie Mae was and is the current holder of the Deed of Trust.

154.    Upon information and belief, Mr. Cooper was and is the servicer of the Deed of Trust.

155.    On July 10, 2019, a hearing was held in the Foreclosure (the "Foreclosure Hearing") in front of Michael E. Honeycutt, the Clerk of Court for Stanly County (the "Clerk of Court").

15

156.    At the Foreclosure Hearing, an Affidavit of Default by Britney Fisher, a Document Execution Associate for Mr. Cooper, was admitted into evidence (the "Affidavit of Default"). The Affidavit of Default is attached hereto and incorporated herein as "Exhibit BB1."

157.    Paragraph 2 of the Affidavit of Default averred that Mr. Cooper maintains records for the Mortgage.

158.    Paragraph 3 of the Affidavit of Default stated that the affiant had personal knowledge of this Mortgage loan, of Mr. Cooper's procedures for creating and maintaining loan records generally and in connection with the Mortgage, that they are made by persons with personal knowledge of a loan and are kept in the usual and ordinary course of business.

159.    Paragraph 4 of the Affidavit of Default swore that Seterus' prior records for the Mortgage were integrated and boarded into Mr. Cooper's systems such that all prior servicer records were integrated into Mr. Cooper's business records.

160.    Paragraph 4 of the Affidavit of Default further said that Mr. Cooper maintains quality control and verification procedures as part of the boarding process to ensure the accuracy of the boarded records.

161.    Paragraphs 7 and 8 of the Affidavit of Default alleged that Plaintiff was in default of the Mortgage for failing to pay monthly installments for the months of July 2018 forward in the principal balance of $57,885.34.

162.    Based on the erroneous statements in the Affidavit of Default, the Clerk of Court entered an Order on July 10, 2019 allowing a foreclosure sale to be conducted. A copy of the Order of Foreclosure is attached hereto and incorporated herein as "Exhibit CC."

163.    Information in the Affidavit of Default was incorrect as to the date of default and the principal balance.

164.    Mr. Cooper knew or should have known that the information in the Affidavit of Default was incorrect.

165.    A Notice of Foreclosure Sale (the "Notice of Sale") was filed and served on the Plaintiff by Damon Gray, II, Attorney at Law, Hutchens Law Firm LLP (attorneys for Substitute Trustee Services, Inc. Substitute Trustee) (the "Substitute Trustee") on July 10, 2019 scheduling a sale of the Property on August 14, 2019. A copy of the Notice of Sale is attached hereto and incorporated herein as "Exhibit DD."

166.    Upon information and belief, the Sale was postponed until September 25, 2019.

167.    On September 5, 2019, Nardone sent a letter to the Substitute Trustee informing it that the Mortgage was not in arrears as stated in the Foreclosure and that the Foreclosure may not be appropriate (the "Letter to Substitute Trustee"). A copy of the Letter to Substitute Trustee is attached hereto and incorporated herein as "Exhibit EE."

168.    No response was received by Nardone or Plaintiff to the Letter to Substitute Trustee.

169.    The Foreclosure Sale was held by the Substitute Trustee on September 25, 2019 and resulted in a bid of $62,629.93 by Mr. Cooper.  A copy of the Report of Foreclosure Sale is attached hereto and incorporated herein as "Exhibit FF."

### F.    Plaintiff Files the Current Bankruptcy Case

170.    After her Property was auctioned in the Foreclosure Sale Plaintiff had little choice but to file the Current Case in order to stay the Foreclosure.

171.    The Current Case was filed on September 27, 2019.

172.    On October 7, 2019, attorney Joseph J. Vonnegut ("Vonnegut") filed a Notice of Appearance saying that he represented Mr. Cooper in the Current Case.  [Doc. No. 10].

173.    On October 31, 2019, a proof of claim prepared by Vonnegut on behalf of Mr. Cooper was filed in the Current Case (the "Current Case Proof of Claim").  A copy of the Current Case Proof of Claim is attached hereto and incorporated herein by reference as "Exhibit GG."

174.    Upon information and belief, Defendant Fannie Mae is not mentioned in the Current Proof of Claim.

175.    The same Promissory Note and Deed of Trust attached to the Prior Case Proof of Claim are attached to the Current Case Proof of Claim.

176.    Pertinent information on the Current Case Proof of Claim are as follows:

a.    Principal and interest payoff of $58,708.34;
b.    Payments in arrears as of May 1, 2019;
c.    Total arrearage of $2,113.51 comprised of principal and interest in the amount of $1,594.85, an escrow shortage of $72.29, and projected escrow deficiency of $597.05;
d.    Pre-petition fees of $0.00.

177.    The Plaintiff's Chapter 13 Plan (the "Plan") was confirmed on February 4, 2020 and provided that the Chapter 13 Trustee (the "Trustee") would disburse ongoing monthly mortgage payments to Mr. Cooper as well as a pro rata amount to cure the alleged arrearage owed on the Mortgage on the Petition Date.  [Doc. No. 38]

### G.    Various Payoff Figures from Seterus and/or Mr. Cooper

178.    Presumed correct payoff figures and sources thereof on the Mortgage on certain dates are as follows:

| | | |
|---|---|---|
| 09/01/09 | $65,082.23 | Loan Modification Agreement |
| 11/27/14 | $60,373.65 | September RFI Response |
| 11/07/16 | $59,533.95 | Prior Case Proof of Claim |

17

179.     The ascertainable correct principal and interest payoff figure based on Mortgage being current as of August 31, 2018 was approximately $51,949.26 as of September 1, 2018 based on the terms of the Loan Modification.

180.     On May 21, 2018, Seterus alleged the principal payoff to be $58,410.73.  A copy of the May 21, 2018 Periodic Account Notice (the "May 21, 2018 Statement") is attached hereto and incorporated herein as "Exhibit HH."

181.     The May 21, 2018 Statement alleged the loan was in default from the October 1, 2017 payment.

182.     On April 25, 2019, Mr. Cooper alleged the principal payoff to be $57,885.34, the total loan payoff to be $62,087.88, and the loan to be due for the July 1, 2018 payment forward. A copy of the April 29, 2019 Mortgage Payoff Statement (the "April 25, 2019 Statement") is attached hereto and incorporated herein as "Exhibit II."

183.     On May 1, 2019, Mr. Cooper alleged the principal payoff to be $57,885.34, provided no total loan payoff figure, and stated that $4,422.98 was needed to bring the Mortgage current.  A copy of the May 1, 2019 Informational Statement (the "May 1, 2019 Statement") is attached hereto and incorporated herein as "Exhibit JJ."

184.     On May 2, 2019, Mr. Cooper alleged the principal payoff to be $57,885.34, the total loan payoff to be $62,154.06, and the loan to be due for the July 1, 2018 payment forward. A copy of the May 2, 2019 Mortgage Payoff Statement (the "May 2, 2019 Statement") is attached hereto and incorporated herein as "Exhibit KK."

185.     Between the April 25, 2019 Statement and the May 2, 2019 Statement, the lender-paid expenses increased by $14.00, and the escrow advances increased by $6.00.

186.     On May 15, 2019, the Pre-Foreclosure Letter alleged a principal payoff of $57,885.34.

187.     On September 13, 2019, Mr. Cooper alleged the principal payoff to be $57,276.25, the total loan payoff to be $63,027.19, and the loan to be due for the April 1, 2019 payment forward.  A copy of the September 13, 2019 Mortgage Payoff Statement (the "September 13, 2019 Statement") is attached hereto and incorporated herein as "Exhibit LL."

188.     Each of the Mortgage Payoff Statements from Mr. Cooper contained a section titled "Projected Estimated Disbursements."

189.     Each of the Mortgage Payoff Statements from Mr. Cooper noted projected disbursements on "county tax" and "hazard sfr."

190.     Upon information and belief, "hazard sfr" referred to the yearly homeowner's insurance premium.

191.     Under the "Projected Estimated Disbursements" read the following: "we will continue to make disbursements of all escrow items (hazard, flood, PMI/MIP, taxes, etc.) up to

18

the date of payoff.  It is the responsibility of the borrower(s) and their closing agent to obtain a refund should a double payment occur."

### H.    Cancellation of Plaintiff's Homeowners' Insurance

192.    The Mortgage has had an escrow account with an escrow component for homeowner's insurance ("HOI") and real property taxes ("Taxes") (collectively the "Escrow Account") since the Mortgage's inception.

193.    Each year, typically in December, Seterus paid the following year's HOI premium from the Escrow Account.[4]  [Claim No. 5, Attachment 1].

194.    In its ordinary course of business for the Mortgage, Seterus paid NC Grange Mutual Insurance Company ("NC Grange") a premium in the amount of $686.00 on December 5, 2018 to renew the current policy for a one-year term from December 16, 2018 through December 16, 2019 (the "NC Grange Policy") from Plaintiff's Escrow Account.  A copy of the Homeowner Policy Declarations is attached hereto and incorporated herein as "Exhibit MM."

195.    Mr. Cooper generated a notice to NC Grange on September 27, 2019 (the Petition Date) that informed NC Grange that Mr. Cooper had foreclosed on the Property (the "Insurance Cancellation Letter").

196.    Despite numerous requests for the Servicing File and all documents therein, Defendant Mr. Cooper has never produced a copy of the Insurance Cancellation Letter to Plaintiff.

197.    The Foreclosure Response[5] stated that the foreclosure sale took place on September 25, 2019, was "acquired," and that the Property was moved to Real Estate Owned (REO) status on September 26, 2019.

198.    In the Servicing Guidelines, Fannie Mae states that a servicer must pay all out-of-pocket costs and expenses incurred in management and disposition of "acquired properties."  *See Servicing Guidelines A2-1-01: General Servicer Duties and Guidelines*, *Servicing Guide*, Fannie Mae (July 10, 2019), https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-A-Doing-Business-with-Fannie-Mae/.

199.    The Servicing Guidelines use the term "acquired" to refer to properties owned by Fannie Mae.

200.    REO means that the lender ***owns*** the real estate.  "Real Estate Owned" is a term for a property owned by a lender because it failed to sell in a foreclosure auction.  *See, e.g.*, Amy Loftsgordon, *What Does REO Mean?*, NOLO, https://www.nolo.com/legal-encyclopedia/what-does-mean-property-reo.html (last visited Dec. 9, 2020); James Chen, *Real Estate Owned (REO)*, Investopedia (updated June 16, 2020),

---

[4] For example, Seterus paid the HOI premiums over the previous few years on the following dates: November 29, 2016, November 29, 2017, and December 5, 2018.

[5] Plaintiff received a response to the Foreclosure NOE dated October 9, 2020 (the "Foreclosure Response").  *See* Exhibit JJJ.

https://www.investopedia.com/terms/r/realestateowned.asp; Katy Herbst de Cortina, *Real Estate and Mortgage Glossary*, PennyMac (June 18, 2018), https://www.pennymacusa.com/blog/real-estate-mortgage-glossary.

201.    Under North Carolina law, the rights of parties to a foreclosure do not become fixed until after the expiration of the upset bid period.  N.C.G.S. § 45-21.29A.

202.    North Carolina law has a 10-day upset bid period.  *See* N.C.G.S. § 45-21.

203.    If a foreclosure is stayed by Section 105 or 362 prior to the expiration of the 10-day upset bid period, the clerk of court must release any deposits held on behalf of any upset bidder, or the holder of a cash deposit from the high bidder at the foreclosure sale must refund any deposit held on their behalf.  *See* N.C.G.S. § 45-21.22(d)(1)-(2).

204.    Fannie Mae did not own the Property on September 26, 2020.

205.    Upon information and belief, Fannie Mae has never owned the Property.

206.    The Foreclosure Response stated that "in accordance with [its] foreclosure process," the Insurance Cancellation Letter was issued to NC Grange.

207.    NC Grange sent Plaintiff a notice on October 9, 2019 informing her that her HOI was cancelled because of the Mr. Cooper Insurance Cancellation Letter (the "Notice of Cancellation of Insurance from NC Grange").  The Notice of Cancellation of Insurance from NC Grange is attached hereto and incorporated herein as "Exhibit NN."

208.    Plaintiff immediately called NC Grange and stated that the Property had not been foreclosed, that a foreclosure had been pending but was stayed by the Current Case filing and not completed.

209.    NC Grange informed the Plaintiff that it had to abide by the notice it received from Mr. Cooper unless Mr. Cooper sent additional information to correct the same.

210.    Since her last insurance policy was cancelled because Mr. Cooper informed her insurance company that the Property had been foreclosed, she had a difficult time obtaining a new homeowner's insurance policy.

211.    The age of the Property also made it more difficult to obtain a replacement HOI policy when the last policy had been cancelled because of foreclosure.

212.    Despite multiple efforts and discussions with several insurance companies, the Plaintiff was unable to get a new insurance policy on the Property for almost six (6) months after it was cancelled.

213.    When a local insurance agent or broker is unable to obtain coverage on a person's behalf in the standard market, they may contact a surplus lines broker with access to the Lloyds of London ("Lloyds") marketplace.  *See* Marianne Bonner, *Lloyd's of London, a Commercial Insurance Marketplace*, The Balance Small Business (updated Feb. 10, 2019), https://www.thebalancesmb.com/what-is-lloyd-s-of-london-462564.

20

214.    Indeed, the only entity through which Plaintiff was able to obtain coverage for the Property was Lloyds, which was a "last resort" option for insuring her home.[6]

215.    The premium for insuring the Property for one year through Lloyds was $1,285.62, which was $599.62 more than the last year's policy premium with NC Grange.  A copy of the Lloyds policy (the "Lloyds Policy") is attached hereto and incorporated herein as "Exhibit OO."

216.    Plaintiff was unable to pay for the Lloyds Policy in one cash payment and had to finance the premium, which cost her an additional $208.49.  A copy of the Premium Finance Agreement is attached hereto and incorporated herein as "Exhibit PP."

217.    The Premium Finance Agreement required Plaintiff to make a cash down payment of $321.41 and then finance $964.21 at a 22.17% interest rate with monthly payments of $117.27.

218.    The Lloyds Policy reduced the amount of coverage of Plaintiff's personal property.

219.    The Lloyds Policy reduced the amount of coverage for loss of use of the Property.

220.    On September 18, 2020, Mr. Cooper filed a Notice of Mortgage Payment Change showing that for the period of November 2020 through October 2021, Plaintiff's mortgage payment escrow portion will increase by $48.48/month, from $94.95/month to $143.43/month, because of the increased HOI premium estimated in the amount of $1,384.00.  A copy of the Notice of Mortgage Payment Change is attached hereto and incorporated herein as "Exhibit QQ."

221.    The increase in the amount of the escrow component for the period of November 2020 through October 2021 for HOI is an increase of over 51%.

## I.    Force Placed Insurance

222.    On October 16, 2019, Mr. Cooper sent Plaintiff a letter alleging that her hazard insurance had expired and informing her that it planned to purchase insurance for the Property if she did not immediately produce proof of current HOI (the "Insurance Expiration Letter").  A copy of the Insurance Expiration Letter is attached hereto and incorporated herein as "Exhibit RR."

223.    On November 7, 2019, Nardone emailed Vonnegut, attaching the Insurance Expiration Letter, and alleged that the insurance should not have expired and that Mr. Cooper should have used escrowed funds to pay for any HOI premiums (the "Nardone Insurance

---

[6] Lloyds is not an insurance company, it is a marketplace where insurance buyers and sellers come together.  It is known for insuring more unusual or risky ventures and objects that standard market insurers would refuse to cover, such as Betty Grable's legs, Bruce Springsteen's voice, and spacecraft.  *See* Marianne Bonner, *Oddities Insured by Lloyds of London*, The Balance Small Business (updated Mar. 13, 2020), https://www.thebalancesmb.com/oddities-insured-by-lloyd-s-462503.

Email"). A copy of the Nardone Insurance Email is attached hereto and incorporated herein as "Exhibit SS."

224. On November 14, 2019, an associate attorney of Vonnegut, Jennifer Brown ("Brown") responded to the Nardone Insurance Email and explained that the Insurance Expiration Letter was routinely sent to a borrower when a forced-placed insurance policy was set to expire in the near future.

225. Nardone and Brown discussed the matter through email exchanges from November 14, 2019 through November 19, 2019 (the "Attorney Insurance Email Exchange"). A copy of the Attorney Insurance Email Exchange is attached hereto and incorporated herein as "Exhibit TT."

226. While Brown diligently attempted to discuss and resolve the matter with Nardone, it appeared the two respectfully disagreed with one another's positions.

227. On November 19, 2019, Nardone sent the final email in the Attorney Insurance Email Exchange informing Brown and Vonnegut that the HOI had not expired, that Mr. Cooper had erroneously informed the insurer that the property was foreclosed, which resulted in cancellation of the same.

228. Upon information and belief, no response was received by Vonnegut or Brown to Nardone's November 19, 2019 email.

229. On December 23, 2019, Mr. Cooper sent Plaintiff a letter titled "Notice of Placement of Insurance" that informed her that Mr. Cooper had purchased an insurance policy for her Property with an annual premium of $1,013.00 because she did not have HOI on the Property (the "Force Placed Insurance"). A copy of the Notice of Placement of Insurance is attached hereto and incorporated herein as "Exhibit UU."

### J.      Background on Requests for Information and Notices of Error Under RESPA

230. On January 17, 2013, the Consumer Financial Protection Bureau (the "CFPB") issued the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) Mortgage Servicing Final Rules, 78 F.R. 10901 (Regulation Z) and 78 F.R. 10695 (Regulation X), which became effective on January 10, 2014.

231. The CFPB issued several final rules concerning mortgage markets in the United States pursuant to the Dodd Frank Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) in January of 2013.

232. The new rules addressed a servicers' obligation to borrowers.

233. RESPA is "a consumer protection statute that regulates the real estate settlement process." *St. Claire v. Ditech Fin., LLC*, No. 1:17-cv-3370-AT-JFK, 2018 U.S. Dist. LEXIS

219661, at \*7 (N.D. Ga. Sept. 21, 2018) (citing *Hardy v. Regions Mortgage, Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (citing 12 U.S.C. § 2601(a)).

234.    As a "remedial consumer-protection statute," RESPA should be construed liberally. *See id.* (citing *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016)).

235.    "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3).

236.    Defendant Seterus serviced the Mortgage Loan.

237.    Defendant Mr. Cooper serviced the Mortgage Loan.

238.    RESPA allows borrowers to make requests for information relating to the servicing of a mortgage loan via "qualified written requests" (a "QWR"). *See Claire*, 2018 U.S. Dist. LEXIS 219661, at \*7 (citing 12 U.S.C. § 2605(e); 12 C.F.R. § 1024.35(a)&(b); *Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905, 907 (11th Cir. 2016)).

239.    12 U.S.C. § 2605(e)(1)(B)(ii) defines a QWR as written correspondence that "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."

240.    RESPA allows borrowers to notify mortgage servicers of possible account errors.

241.    A QWR that asserts an error relating to the servicing of a mortgage loan is a notice of error under 12 C.F.R. § 1024.35(a).

242.    A Request for Information is a QWR.

243.    A Notice of Error ("NOE") is a QWR.

244.    A servicer must comply with all requirements applicable to a NOE with respect to a QWR under 12 C.F.R. § 1024.36(a).

245.    12 C.F.R. § 1024.35(e)(1)(i) requires a servicer of a federally related mortgage loan to respond to an NOE by either:

23

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B)  Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

246.    The Mortgage is a "federally related mortgage loan" as said term is defined in 12 C.F.R. § 1024.2(b).

247.    Defendant Seterus is subject to the aforesaid Regulations and does not qualify for the exception for "small servicers" as defined in 12 C.F.R. § 1026.41(e)(4) or the exemption for a "qualified lender" as defined in 12 C.F.R. § 617.700.

248.    Defendant Mr. Cooper is subject to the aforesaid Regulations and does not qualify for the exception for "small servicers" as defined in 12 C.F.R. § 1026.41(e)(4) or the exemption for a "qualified lender" as defined in 12 C.F.R. § 617.700.

249.    Plaintiff is asserting a claim for relief against Defendant Seterus for breach of the specific rules under Regulation X as set forth below.

250.    Plaintiff is asserting a claim for relief against Defendant Mr. Cooper for breach of the specific rules under Regulation X as set forth below.

251.    Plaintiff has a private right of action for the claimed breaches under RESPA pursuant to 12 U.S.C. § 2605(f) and such actions provide for remedies including actual damages, statutory damages, and attorney fees.

## COUNT ONE
### VIOLATION OF 11 U.S.C. § 524(i), 11 U.S.C. § 105, and CONTEMPT

252.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

253.    The Order Confirming Plan in the Prior Case bound the Plaintiff and all her creditors, including any assignees of those creditors. *See* 11 U.S.C. § 1327.

254.    Even creditors that are not provided for in the Plan are bound by the Plan. *See id*.

255.    "Once a discharge is entered, the automatic stay terminates and the discharge injunction takes effect to prevent creditors' efforts to collect on debts that were discharged."

*Williams v. CitiFinancial Servicing LLC (In re Williams)*, 612 B.R. 682, 690 (Bankr. M.D.N.C. 2020).

256.    The Discharge Order operated as an injunction against any act to collect, recover, or offset any such debt as a personal liability of the Debtor.  *See* 11 U.S.C. § 524(a)(2).

257.    Pursuant to Section 105(a), this Court has the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).

258.    Under Section 105(a), the Court is authorized to hold a party in civil contempt for failing to comply with a previous order of the Court.  *See Cherry v. Arendall (In re Cherry)*, 247 B.R. 176, 186 (Bankr. E.D. Va. 2000).

259.    The Discharge Order is an order of this Court, and its violation is punishable by civil sanctions.  *See id.* at 187.

260.    Bankruptcy courts may sanction parties for improper conduct, including conduct that "abuses the judicial process."  *See Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

261.    Sanctions may include actual damages, attorney's fees, and punitive damages. *See In re Cherry*, 247 B.R. at 187.

262.    Seterus was a participant in the Prior Case and had actual and constructive knowledge of the Plan and Discharge Order.

263.    As a transferee of Seterus, Mr. Cooper had actual and constructive knowledge of the Plan and Discharge Order.

264.    As a transferee of Seterus, Mr. Cooper is vicariously liable for acts of Seterus regarding the Mortgage.

265.    Mr. Cooper had actual knowledge of the First and Second Motions for Relief from Stay and their resolutions because Plaintiff's attorney provided it with the same.

266.    "[T]he Bankruptcy Code requires mortgage creditors to properly apply any payments received on [mortgage] debts during the chapter 13 case as part of a confirmed plan.  A creditor's failure to do so is treated under § 524(i) . . . ."  *In re Williams*, 612 B.R. at 690.

267.    A proceeding under § 524(i) is not limited to acts that occurred post-discharge and may relate to a creditor's conduct that occurred prior to the discharge.  *See id.* (citing *Santander Consumer, USA, Inc. v. Houlik (In re Houlik)*, 481 B.R. 661, 672 (B.A.P. 10th Cir. 2012)).

268.    Seterus repeatedly and willfully misapplied mortgage payments during the Prior Case by applying payments to prior month's payments that it incorrectly deemed to be in default.

25

269.    Seterus repeatedly and willfully misapplied mortgage payments during the Prior Case by applying payments haphazardly and incorrectly despite Court admissions of the Mortgage payments being current on certain dates.

270.    A comparison of the Payment History with the Motions for Relief from Stay demonstrates numerous misapplications of mortgage payments.

271.    Seterus assessed property inspection and other fees to the Mortgage during the Prior Case at times when the Mortgage was not in default.

272.    Seterus willfully misapplied payments by applying payments to property inspections and other default related fees.

273.    Seterus willfully misapplied payments after deeming the Mortgage to be current after the First Motion to Relief from Stay.

274.    Seterus willfully misapplied payments after deeming the Mortgage to be current after the Second Motion to Relief from Stay.

275.    Seterus willfully failed to correct the Payment History and note the Mortgage current as of October 10, 2017.

276.    Seterus willfully failed to correct the Payment History and note the Mortgage current as of August 31, 2018.

277.    The Default Letter sent nineteen (19) days after Mr. Cooper assumed servicing the Mortgage demonstrated that Seterus misapplied payments.

278.    The Default Letter demonstrated that Seterus misrepresented the total amount Plaintiff owed on the Mortgage.

279.    Mr. Cooper willfully failed to review the records it allegedly obtained from Seterus to verify the information on the Mortgage was correct.

280.    Mr. Cooper willfully failed to correct the Payment History, despite alleging that it did, after receiving the May 2019 NOE.

281.    Said failure of Mr. Cooper to correct the Payment History constitutes the misapplication of payments.

282.    In its letters and statements to Plaintiff, Mr. Cooper misrepresented the total amount Plaintiff owed on the Mortgage.

283.    In its letters and statements to Plaintiff, Mr. Cooper misrepresented to Plaintiff that the Mortgage was in default from the July 1, 2018 payment forward.

284.    Mr. Cooper willfully failed to stop the Foreclosure Proceeding after receiving the May 2019 NOE.

26

285.    Mr. Cooper willfully failed to stop the Foreclosure Proceeding after receiving the Letter to Substitute Trustee.

286.    Mr. Cooper willfully failed to provide corrected and accurate information on the default status of the Mortgage during the Foreclosure Proceeding.

287.    Mr. Cooper willfully auctioned the Plaintiff's home at the Foreclosure Sale.

288.    The misapplication of payments by Seterus caused material injury to the Plaintiff.

289.    The misapplication of payments by Mr. Cooper caused material injury to the Plaintiff.

290.    The assessment of fees to the Mortgage by Seterus caused the Mortgage balance to increase.

291.    The assessment of fees to the Mortgage by Mr. Cooper caused the Mortgage balance to increase.

292.    The misapplication of payments by Seterus caused a higher payoff balance and a larger lien on the Plaintiff's Property than if payments were credited properly.

293.    The misapplication of payments by Mr. Cooper caused a higher payoff balance and a larger lien on the Plaintiff's Property than if payments were credited properly.

294.    The misapplication of payments by Seterus caused Plaintiff and her Mother emotional distress from having to defend against allegations of being behind on payments during the Prior Case.  While Mother is not a Plaintiff herein, Plaintiff's stress was increased by her Mother's stress and the attempts required by her to try to soothe Mother's concerns.

295.    The misapplication of payments by Seterus caused Plaintiff and her Mother emotional distress over fear of losing the Property and being sued for foreclosure.

296.  The misapplication of payments by Mr. Cooper caused Plaintiff and her Mother emotional distress over fear of losing the Property and being sued for foreclosure.  While Mother is not a Plaintiff herein, Plaintiff's stress was increased by her Mother's stress and the attempts required by her to try to soothe Mother's concerns.

297.    Plaintiff experienced disturbed sleep, increased blood pressure, headaches, depression, gastric distress, grinding teeth, weakened immune system, mood swings, increased fatigue, and anxiety from the actions of Seterus.

298.    Plaintiff experienced disturbed sleep, increased blood pressure, headaches, depression, gastric distress, grinding teeth, weakened immune system, mood swings, increased fatigue, and anxiety from the actions of Mr. Cooper.

299.    Mother experienced fear over the prospect of losing her home, which caused Plaintiff to have to attempt to calm her concerns and prevent more stress on her Mother who was undergoing chemotherapy during this time.

27

300.    After completing a five (5) year Bankruptcy case, which included successfully overcoming the Motions for Relief from Stay, the actions of Seterus and Mr. Cooper caused Plaintiff to fear that regardless of taking all required steps to receive her discharge, she could lose the Property without being behind on the payments.

301.    Emotional distress due to a creditor's actions and conduct can constitute actual damages.

302.    A plaintiff is entitled to damages for emotional distress when she has "in fact suffered significant emotional harm and the circumstances surrounding the violation make it obvious that a reasonable person would suffer significant emotional harm." *Dawson v. Washington Mut. Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1151 (9th Cir. 2004).

303.    The actions of Seterus are egregious because twice in the Prior Case it stated on the record that Plaintiff was current on her payments yet it did not update the Payment History to show the same.

304.    As a result of keeping inaccurate payment records, Seterus egregiously and repeatedly assessed fees for property inspections and other default-related events to a loan that was not in default.

305.    The actions of Mr. Cooper are egregious because, despite admitting that the Mortgage was current per the Court records from the Prior Case as of August 2018, it proceeded with a foreclosure action and entered an Affidavit into evidence that alleged a default of monthly payments due from July 2018 forward after receiving information from Plaintiff's attorney to the contrary.

306.    The actions of Mr. Cooper are egregious because it proceeded to hold the Foreclosure Sale despite having received the information contradicting its records from Plaintiff's attorney and the Substitute Trustee receiving the Letter to Substitute Trustee.

307.    The actions of Mr. Cooper are egregious because it informed NC Grange that the Property was in REO status when it was not.

308.    Mr. Cooper caused Plaintiff's HOI to be cancelled.

309.    Mr. Cooper caused Plaintiff's HOI premiums to skyrocket.

310.    The actions of Mr. Cooper are egregious because it force placed insurance on the Property when it caused the unexpired NC Grange policy to be cancelled by providing erroneous information about the ownership status of the Property.

311.    The actions of Mr. Cooper are egregious because it then billed the Plaintiff for the FPI.

312.    Plaintiff is entitled to actual damages, including for significant emotional distress, for the suffering she has endured as a direct result of the conduct of Seterus and Mr. Cooper.

28

313. Mr. Cooper forced Plaintiff to have to file the Current Case in order to stop the Foreclosure.

314. Plaintiff feared, despite reassurances from her attorney, that filing the Current Case would not stop the foreclosure because of the prior mismanagement of her Mortgage and insistence on foreclosure by Mr. Cooper.

315. Plaintiff incurred reasonable and necessary attorney fees to protect her rights under the Prior Case.

316. To date, Plaintiff has paid $4,350.00 to the undersigned for representation in the Current Case with an additional $250.00 remaining to be paid in the Plan.

317. During discovery, Plaintiff expects to gather evidence from Seterus and Mr. Cooper that will establish a pattern and practice of these Defendants for willfully disregarding Orders of this Court, the Bankruptcy Code, and North Carolina law such that an award of punitive damages is appropriate and necessary to deter similar conduct in the future.

318. Upon information and belief, an award of punitive damages by this Court is necessary to cause Seterus and Mr. Cooper to cease to engage in conduct that is in direct violation to the provisions of the Bankruptcy Code.

## COUNT TWO
## VIOLATION OF 11 U.S.C. § 362

319. The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

320. Upon the filing of the Prior Case, the automatic stay of Section 362 was imposed.

321. Fannie Mae and Seterus were active participants in the Prior Case and had actual knowledge of the automatic stay.

322. Mr. Cooper had actual knowledge of the automatic stay as Active Bankruptcy status was noted on their Welcome Letter.

323. Although a debtor loses the protection of the automatic stay when a case is no longer pending, "consequences directly attributable to the violation of the stay before its expiration may continue to be visited upon a debtor for an additional period of time;" thus, "liability for a stay violation continues at least until full restitution is actually made or, if after the expiration of the stay, the court orders full restitution." *Houck v. Substitute Tr. Servs., Inc. (In re Houck)*, No. 11-51513, AP 15-5028, 2020 Bankr. LEXIS 2780, at *22 (Bankr. W.D.N.C. Oct. 6, 2020) (quoting *Sundquist v. Bank of Am., N.A. (In re Sundquist)*, 566 B.R. 563, 587 (Bankr. E.D. Cal. 2017) (citing *Snowden v. Check Into Cash of Wash., Inc. (In re Snowden)*, 769 F.3d 651, 659, 662 (9th Cir. 2014))).

324. Full restitution includes all of Plaintiff's damages since the violation occurred. *See id.* at *22–23.

29

325.    Under § 362(k), any individual "injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorney's fees, and in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).

326.    All Defendants, directly or indirectly through its agents, collected, assessed, or recovered a claim against the Plaintiff that occurred before the commencement of the Prior Case, during the Prior Case, before the commencement of the Current Case, and/or during the Current Case.

327.    Each Defendant's actions were willful and constituted willful violations of the automatic stay.

328.    The filings of the Motions for Relief from Stay in the Prior Case constituted acts to collect a debt from Plaintiff while the automatic stay was in effect when the Loan was not in default.

329.    The communication with the Plaintiff during the Prior Case through the Motions for Relief from Stay constituted attempts to collect a debt from the Plaintiff while the automatic stay was in effect and the Loan was not in default.

330.    The misapplication of payments during the Prior Case by Seterus is a willful violation of the automatic stay.

331.    The failure to correct the known misapplication of payments during the Prior Case by Seterus is a willful violation of the automatic stay by Mr. Cooper.

332.    The misapplication of payments under the Prior Case's Plan increased the total payoff balance of Plaintiff's mortgage.

333.    The assessment of default related fees to the Mortgage during the Prior Case is a willful violation of the automatic stay.

334.    Seterus and Mr. Cooper attempted to collect funds that were not owed to it by Plaintiff.

335.    Upon information and belief, Mr. Cooper seeks to collect funds not owed to it by Plaintiff in the Current Case.

336.    While Mr. Cooper's records were incorrect and Plaintiff was not in an active bankruptcy on March 13, 2019, the Default Letter dated seven (7) days later demonstrated a blatant disregard for whether she was protected by the automatic stay or not.

337.    The issuance of the Insurance Cancellation Letter to NC Grange in the Current Case post-petition is a willful violation of the automatic stay.

338.    The collection of the higher HOI premiums by Mr. Cooper during the Current Case is a willful violation of the automatic stay.

339.    Plaintiff suffered actual damages from the violation of the automatic stay by Defendants including but not limited to fees added to the Mortgage, an inflated payoff figure, increased HOI premiums, attorney's fees, and emotional distress.

340.    As a result of Defendants' actions, Defendants are liable to Plaintiff for actual damages, statutory damages, costs, and attorney's fees under Section 362(k).

## COUNT THREE
## VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT

341.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

342.    "The FDCPA prohibits a debt collector from using 'any false, deceptive, or misleading representation or means in connection with the collection of any debt,' and from using 'unfair or unconscionable means to collect or attempt to collect any debt.'" *Spencer v. Hughes Watters Askanase, LLP*, No. 5:15-cv-00233, 2015 U.S. Dist. LEXIS 75563, at *12 (W.D. Tex. June 3, 2015) (citing 15 U.S.C. §§ 1692(e)–(f)).

343.    "The FDCPA protects consumers from abusive and deceptive practices by debt collectors, and protects non-abusive debt collectors from competitive disadvantage." *United States v. Nat'l Fin. Serv., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996) (citing 15 U.S.C. § 1692(e)).

344.    Seterus and Mr. Cooper are debt collectors as defined in 15 U.S.C. § 1692a(6).

345.    Plaintiff is a consumer under 15 U.S.C. § 1692a(3).

346.    Plaintiff was the object of collection activity arising from a consumer debt.

347.    The actions of Seterus and Mr. Cooper involve attempts to collect a "debt" as the term is defined in 15 U.S.C. § 1692a(5).

348.    Section 1692e prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

349.    Communications to Plaintiff by Seterus were deceptive.

350.    Communications to Plaintiff by Mr. Cooper were deceptive.

351.    Allegations by Seterus in the Motions for Relief from Stay were erroneous.

352.    The Motions for Relief from Stay stated that their purpose was to collect on the Mortgage debt.

353.    The Motions for Relief from Stay misrepresented the amount owed on the Mortgage and its status as being in default.

354.    The Motions for Relief from Stay threatened to collect an inflated mortgage reinstatement amount and payoff amount due in part to charges and fees that were inflated or did not occur

355.     The Payment History that Seterus maintained and transferred to Mr. Cooper misrepresented the amount owed on the Mortgage and alleged the same was higher than it was.

356.     The Default Letter misrepresented the amount owed on the Mortgage and alleged the same was higher than it was.

357.     The Default Letter threatened to collect an inflated mortgage reinstatement amount and payoff amount due in part to charges and fees that were inflated or did not occur.

358.     The Default Letters threatened to accelerate that Mortgage, foreclosure proceedings, and sale of the property if the inflated reinstatement figure was not paid by a certain date.

359.     The Pre-Foreclosure Letter misrepresented the amount owed on the Mortgage and alleged the same was higher than it was.

360.     The Pre-Foreclosure Letter threatened to collect an inflated mortgage payoff amount due in part to charges and fees that were inflated or did not occur.

361.     The Mortgage Payoff Statements misrepresented the amount owed on the Mortgage and alleged the same was higher than it was.

362.      The Mortgage Payoff Statements threatened to collect an inflated mortgage reinstatement amount and payoff amount due in part to charges and fees that were inflated or did not occur.

363.     The Mortgage Informational Statements misrepresented the amount owed on the Mortgage and alleged the same was higher than it was.

364.     The Mortgage Informational Statements threatened to collect an inflated mortgage reinstatement amount and payoff amount due in part to charges and fees that were inflated or did not occur.

365.     Fees related to default, such as property inspection fees, assessed to the loan by Seterus were not allowed to be assessed under the terms of the Note, Deed of Trust, or Servicing Guidelines.

366.     Seterus assessed property inspection fees of $15.00 per month for the months of August, September, and October 2018 after admitting the Mortgage was current through August 2018.

367.     Seterus assessed a legal fee in the amount of $181.00 on October 1, 2018 when the Mortgage was current.

368.     The following fees were assessed by Mr. Cooper pre-petition when the Mortgage would have been current if it honored the AutoPay agreement between Seterus and Plaintiff and withdrew the payments from Plaintiff's bank account:

| 03/20/2019 | $75.00 | FC Fee |
| 04/15/2019 | $12.00 | Property Inspection |

32

| 04/16/2019 | $12.76 | Late Charges |
| 04/24/2019 | $14.00 | Property Inspection |
| 05/20/2019 | $300.00 | Filing Costs |
| 05/20/2019 | $60.00 | Sheriff Costs |
| 05/21/2019 | $937.50 | FC Fee |
| 05/26/2019 | $11.20 | Certified Mail |
| 06/06/2019 | $225.00 | Title Examinte [sic] |
| 06/20/2019 | $14.00 | Property Inspection |
| 07/10/2019 | $693.75 | FC Fee |
| 07/24/2019 | $14.00 | Property Inspection |
| 07/31/2019 | $450.00 | Publication |
| 08/20/2019 | $14.00 | Property Inspection |

369. Seterus provided an inflated payoff figure of $58,410.73 on the May 21, 2018 Statement when the correct payoff figure should have been approximately $52,000.00.

370. Mr. Cooper provided an inflated payoff figure and misrepresented the status of default on the April 25, 2019 Statement.

371. Mr. Cooper provided an inflated payoff figure and misrepresented the status of default on the May 1, 2019 Statement.

372. Mr. Cooper provided an inflated payoff figure and misrepresented the status of default on the May 2, 2019 Statement.

373. Upon information and belief, Mr. Cooper provided an inflated payoff figure and misrepresented the status of default on the September 13, 2019 Statement.

374. Section E-3.1-02 of the Servicing Guidelines required Mr. Cooper to perform due diligence by "making every reasonable effort to cure the delinquency through Fannie Mae's various workout options before referring a mortgage loan for foreclosure proceedings."

375. No information was provided by Seterus to Plaintiff after the Discharge Order and prior to the transfer to Mr. Cooper about default options or ways to avoid foreclosure.

376. Upon information and belief, Mr. Cooper did not send any information to Plaintiff regarding default options until after it referred the Mortgage to an attorney for foreclosure.

377. If Mr. Cooper sent Plaintiff information regarding default options, it referred the Mortgage to an attorney for foreclosure within sixty (60) days of the same.

378. Mr. Cooper failed to follow the Servicing Guidelines and did not make every reasonable effort to allow Plaintiff to cure delinquency through Fannie Mae's workout options prior to referring the Mortgage to an attorney for foreclosure.

379. Mr. Cooper refused to accept payment for less than the alleged full reinstatement amount in March of 2019.

33

380.    By refusing to accept any payment from Plaintiff that would have aided in curing delinquency, Mr. Cooper caused the delinquency to increase.

381.    Section E-1.2-02 of the Servicing Guidelines states that "for all mortgage loans secured by a principal residence, the servicer must refer the mortgage loan to foreclosure no earlier than the 121st day of delinquency. . ."

382.    The Mortgage was established when the loan was secured by Plaintiff's principal mortgage.

383.    Upon information and belief, the records of Seterus and Mr. Cooper deemed the Mortgage to be a loan secured by a principal residence.

384.    The Mortgage is secured by the principal residence of Mother.

385.    Upon information and belief, Mr. Cooper transferred the Mortgage to the attorney less than sixty (60) days after becoming the servicer.

386.    Upon information and belief, Mr. Cooper did nothing to verify the Payment History and determine the correct date of any delinquency.

387.    Section E-1.2-02 of the Servicing Guidelines further provides that foreclosure is considered to have begun on the date when the servicer refers the matter to a law firm and that the servicer must maintain a record of the date of the referral in the mortgage loan file.

388.    Mr. Cooper did not disclose the date of referral to Hutchens Law Firm in any of its Responses to Plaintiff's RFIs.

389.    Mr. Cooper sought to collect default related fees assessed by Seterus that were not authorized by the Note or Deed of Trust.

390.    Mr. Cooper assessed and attempted to collect default related fees that it assessed to the Mortgage that could have been reduced or avoided if it had honored the AutoPay and accepted payments.

391.    Mr. Cooper submitted the Affidavit of Default into evidence in a court proceeding after admitting in its June 2019 Response that the Mortgage was not in default by the amounts stated in the Affidavit of Default.

392.    The Affidavit of Default contained false representation concerning the extent of the default and delinquency of the Mortgage.

393.    Submission of the Affidavit of Default in its attempt to collect the Mortgage debt.

394.    Submission of the Affidavit of Default constituted a violation of 15 U.S.C. § 1692e(10).

395.    Section E-1.2-02 of the Servicing Guidelines contains the following "**Note:** If the servicer learns of a change in mortgage loan status after referring the mortgage loan to foreclosure, the servicer must promptly notify the law firm of the change."

34

396.    Upon information and belief, Mr. Cooper did not inform Hutchens Law Firm of the updates to the Payment History, which showed a significantly lower delinquency amount, prior to the foreclosure hearing.

397.    Mr. Cooper knowingly filed a false Affidavit of Default in the Foreclosure Proceeding.

398.    Mr. Cooper did not file any document in the Foreclosure Proceeding to correct the Affidavit of Default or any information therein.

399.    According to the June 2019 Response, Mr. Cooper would correctly apply the mortgage payments and provide an updated payoff.

400.    Upon information and belief, Mr. Cooper did not provide Plaintiff with any updated loan payoff or reinstatement figure after the June 2019 Response.

401.    Mr. Cooper did not pause the Foreclosure in order to fully investigate or give Plaintiff further information on default options or paying a reduced reinstatement amount.

402.    Mr. Cooper sent a deceptive statement to NC Grange that resulted in Plaintiff's HOI being wrongly cancelled.

403.    Seterus and Mr. Cooper engaged in acts or omissions prohibited by the FDCPA.

404.    Plaintiff is entitled to actual damages under 15 U.S.C. § 1692k(a)(1) against Seterus and Mr. Cooper.

405.    Plaintiff is entitled to statutory damages under 15 U.S.C. § 1692k(a)(2) against Seterus and Mr. Cooper.

406.    Plaintiff is entitled to costs and attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3) against Seterus and Mr. Cooper.

407.    While some of the FDCPA claims against Seterus arose post-petition or post-discharge in the Prior Case, Seterus created issues that are involved in the Current Case and any recovery therefrom would have an effect on the bankruptcy estate in the Current Case.

408.    The FDCPA claims against Seterus occurred pre-petition in the Current Case and any damages awarded for the same would benefit the bankruptcy estate in the Current Case.

409.    The FDCPA claims against Mr. Cooper are pre-petition in the Current Case and any damages awarded for the same would benefit the bankruptcy estate in the Current Case.

## COUNT FOUR
## VIOLATION OF REAL ESTATE SETTLEMENT PROCEDURES ACT

410.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

35

### A.    Plaintiff's April RFI and Defendant Mr. Cooper's Responses

411.    On April 16, 2019, Plaintiff wrote an RFI under 12 U.S.C. § 2605(e) to Mr. Cooper (the "April RFI") requesting a copy of the servicing file, life of loan history, and current payoff.  A copy of the April RFI is attached hereto and incorporated herein as "Exhibit VV."

412.    On April 30, 2019, Mr. Cooper responded to the April RFI (the "April Response").  A copy of the April 2019 Response is attached hereto and incorporated herein as "Exhibit WW."  The following are parts of Mr. Cooper's responses:

a.    An allegation that part of the April RFI requested information that did not pertain directly to the servicing account and/or did not identify any servicing errors, and/or was proprietary and confidential.  Mr. Cooper deemed the same to be outside the scope of information that must be provided and did not produce the same.

b.    Identification of Fannie Mae as the current owner of the Note.

c.    Refusal to provide requested recorded phone calls or written transcripts of the same alleging that Mr. Cooper does not create transcripts of calls in the ordinary course of business and that the volume of the request would be unduly burdensome and not reasonably likely to assist in confirming any asserted errors.

413.    The April Response alleged that Mr. Cooper could not produce the recorded calls or written transcripts of calls on the account because it "does not create transcripts of calls in the ordinary course of business."  Said response does not explain why recorded calls were not produced.

414.    The April Response violated RESPA by failing to produce material that Plaintiff is entitled to and failing to explain why recorded calls were not produced.

415.    Upon information and belief, Mr. Cooper either records all calls from borrowers, transcribes all calls from borrowers, or both.

416.    Mr. Cooper claimed Plaintiff's request for the recorded calls was unduly burdensome.

417.    The CFPB's official interpretation of Regulation X provides that borrowers are allowed to request copies of telephonic communication with a servicer.  *See St. Claire v. Ditech Fin., LLC*, No. 1:17-cv-3370-AT-JFK, 2018 U.S. Dist. LEXIS 219661, at *37–38 (N.D. Ga. Sept. 21, 2018); *see also Comment for 1024.36 – Requests for Information*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/rules-policy/regulations/1024/Interp-36/ (last visited Dec. 9, 2020).

418.    "The servicer's personnel have access in the ordinary course of business to audio recording files with organized recordings or transcripts of borrower telephone calls and can identify the communication referred to by the borrower through reasonable business efforts.  The

36

information requested by the borrower is available to the servicer." *Id.* at \*38 (citing 12 C.F.R. § 1024.36(d)(1)(ii)).

419.    Upon information and belief, Mr. Cooper received less than ten (10) calls on Plaintiff's Mortgage.  Production of recordings or transcripts of these calls is not unduly burdensome.

420.    Upon information and belief, Mr. Cooper failed to look to see how many, if any, calls were recorded on Plaintiff's account before sending the April Response.

421.    Furthermore, Mr. Cooper stated that recorded phone calls or transcripts from Plaintiff's account were not "reasonably likely to assist [Plaintiff] in confirming any asserted errors."

422.    Mr. Cooper could not predict what future errors would be asserted regarding Plaintiff's Mortgage or what information in phone records would be helpful for the same.

423.    The April Response violated RESPA by providing inaccurate or misleading information on its process and how difficult it would be to produce Plaintiff's request for recorded calls on her account.

424.    Agreeing to "investigate" and "research the call" if given a "specific date a conversation related to a specific error was had" then maybe giving information on the same does not satisfy the requirements under RESPA to provide information to borrowers on the servicing of their loans.

425.    RESPA requires mortgage servicers to "reasonably respond to Notices of Error," which "require[s] more than merely a substantive response to a claimant's NOE.  The provisions also require a servicer to conduct a reasonable investigation into the alleged error."  12 U.S.C. § 2605(e); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016).

426.    The paragraph in the April Response under "Requests for All Recorded Calls" is a boilerplate, generic statement that, upon information and belief, Mr. Cooper includes in all initial responses to RFIs.

427.    Upon information and belief, Defendant Mr. Cooper engages in a pattern and practice of using form responses to respond to Notices of Error with boilerplate language.

428.    Mr. Cooper's policy to use form responses to respond to Notices of Error with boilerplate language is a pattern or practice of violating RESPA.

429.    Upon information and belief, Defendant Mr. Cooper has an internal policy of responding to Notices of Error with boilerplate language that does not comply with RESPA.

430. Mr. Cooper's internal policy of responding to Notices of Error with boilerplate language is a pattern or practice of violating RESPA.

431. The April Response violated RESPA by failing to reasonably investigate the volume of phone call recordings or transcripts and whether the same would be relevant to identifying servicing errors by Defendants Seterus or Mr. Cooper.

432. The April Response violated RESPA by failing and refusing to provide Plaintiff's RFI regarding recordings or transcripts of phone calls related to her account.

433. Plaintiff was damaged by being robbed of the benefit of receiving a record of the phone calls she had with Mr. Cooper regarding her dispute on being behind on payments, being enrolled in AutoPay, attempting to pay regularly scheduled payments, issues surrounding the cancelation of her HOI, and her obtaining replacement HOI.

434. Plaintiff was damaged by not having information that is relevant to numerous servicing errors alleged herein when preparing to engage in litigation with Defendants Mr. Cooper and Seterus.

435. Plaintiff was damaged by not receiving information in the exclusive control of Defendant Mr. Cooper that she will now only be able to obtain through discovery requests in a lawsuit when the same would have benefitted her in preparing this Complaint and prosecuting this Adversary Proceeding.

436. Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over whether recordings or transcripts of phone calls made between her and Defendant Mr. Cooper existed and whether she would gain access to the same.

437. On May 2, 2019, Mr. Cooper responded to the April 2019 RFI (the "May Response"). A copy of the May Response is attached hereto and incorporated herein as "Exhibit XX."

438. On May 3, 2019, Mr. Cooper responded to the April RFI (the "May Fee Response"). A copy of the May Fee Response is attached hereto and incorporated herein as "Exhibit YY." The May Fee Response itemized the following fees totaling $1,140.31:

| $256.00 | Prior legal fees |
|---------|------------------|
| $210.00 | Inspection |
| $71.85 | Prior servicer advance |
| $26.00 | Property insurance |
| $6.00 | Fire insurance |
| $570.46 | Escrow balance at time of transfer |

38

439.   The May Fee Response violated RESPA by simply itemizing the fees charged to the Mortgage without investigating the same to see if they were proper or providing any documentation to substantiate the same.

440.   The May Fee Response violated RESPA by failing to give any information on the itemized fees other than the amount and a description of the fee. No dates were provided, no invoices, and no proof of said payments of any of the itemized fees by Defendants Seterus or Mr. Cooper.

441.   Plaintiff was damaged by not receiving this information because she could not verify the validity of any of the fees in order to determine if Defendants Seterus or Mr. Cooper were in compliance with the Loan Documents or Servicing Guidelines.

**B.      Plaintiff's May NOEs and Mr. Cooper's Response**

442.   Under 12 C.F.R. § 1024.35(b)(3), a servicer must credit a periodic payment to the consumer's loan account as of the date of receipt.

443.   Under 12 C.F.R. § 1024.35(b)(6), a servicer must provide an accurate payoff balance upon borrower's request.

444.   On May 30, 2019, Plaintiff wrote four requests under 12 U.S.C. § 2605(e) to Mr. Cooper (collectively the "May NOEs") alleging numerous servicing errors as follows:

a.      First NOE (the "May NOE #1") made several inquiries to Mr. Cooper, including the below. A copy of the May NOE #1 is attached hereto and incorporated herein as "Exhibit ZZ":
   • Failure to accept and credit payments
   • Failure to provide accurate payoff statement
   • The Basis for Notice of Error summarized the withdrawal of the Second Motion for Relief from Stay, how the Mortgage was admittedly current through August 2018, and how Mr. Cooper's records did not reflect the same. Loan payments were applied to payments due approximately six months prior to their payment date and to months already admittedly paid.
   • No less than eleven (11) actionable errors were calculated.

b.      Second NOE (the "May NOE #2") made several inquiries to Mr. Cooper, including the below. A copy of the May NOE #2 is attached hereto and incorporated herein as "Exhibit AAA":
   • Imposing a fee or charge that the servicer lacks a reasonable basis to impose on the borrower

39

•        Noted escrow advances on August 27, 2018, December 5, 2018, and February 12, 2019 that were not credited back to the account

•        No less than three (3) actionable errors were calculated.

c.        Third NOE (the "May NOE #3") made several inquiries to Mr. Cooper, including the below.  A copy of the May NOE #3 is attached hereto and incorporated herein as "Exhibit BBB":

•        Failure to accept payments of borrower

•        Noted that Plaintiff had attempted to pay monthly payments and was improperly denied the opportunity to do so on at least three occasions

•        No less than three (3) actionable errors were calculated.

d.        Fourth NOE (the "May NOE #4") made several inquiries to Mr. Cooper, including the below.  A copy of the May NOE #4 is attached hereto and incorporated herein as "Exhibit CCC":

•        Imposing a fee or charge that the servicer lacks a reasonable basis to impose on the borrower

•        Noted that property inspection fees were conducted when the Mortgage was not delinquent; some were refunded but six (6) were not.

•        Two forbearance fees of $150.68 were charged on March 7 and March 20, 2019; one was refunded but one was not.

•        No less than seven (7) actionable errors were calculated.

445.    Plaintiff received a response to the May NOEs dated June 18, 2019 (the "June Response").  A copy of the June Response is attached hereto and incorporated herein as "Exhibit DDD."

446.    The third paragraph stated "our research confirmed the previous servicer, Seterus, LLC, filed a Motion for Relief (MFR) on July 13, 2018, but then withdrew the MFR on September 4, 2018.  It stated the MFR was rescinded due to the account being post-petition current for August 1, 2018 as of September 4, 2018."  Said statement appears in line with the Withdrawal of the Second Relief from Stay.

447.    The June Response contained several erroneous or inconclusive statements.

448.    The following paragraph ("Paragraph Four") reads:

Per the payment ledger on September 4, 2018, the account was next due for November 1, 2017.  However, since the previous servicer has said the account should be current, we will advance the account 10 installments to comply with the bankruptcy plan.  Please note, once the corrections are made, we will generate a Payoff Quote and it will be mailed to you separately.  In addition, due to the

delinquent status of the account at the time of transfer installments would not be accepted.

449.    The June Response was a violation of RESPA by providing an erroneous and inaccurate allegation that Seterus was mistaken in its filings with the Court when it stated that the Mortgage was current through August 2018.

450.    The June Response was a violation of RESPA by providing an erroneous and inaccurate allegation that the payment ledger was accurate while Seterus' admission that the loan was current was not.

451.    The June Response was a violation of RESPA by Defendant Mr. Cooper's failure to correct the payment ledger to match the record in the Prior Case noting the loan current through August 2018.

452.    Advancing the account by ten (10) installment payments was not equivalent to noting the account current through August 2018 then applying payments made subsequently pursuant to the terms of the Note and Deed of Trust.

453.    Defendant Mr. Cooper has never explained why it believes that Seterus' report to the Court was wrong and that its calculations are correct.

454.    The June Response was a violation of RESPA by providing an erroneous and inaccurate payment history.

455.    The June Response was a violation of RESPA by failure of Defendant Mr. Cooper to correct its application of payments made by Plaintiff after August 2018 to months prior to August of 2018.

456.    Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over how much was owed on the Mortgage.

457.    Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over whether the Mortgage was ever in default post-August 2018, and if so, when.

458.    Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety that her current servicer would blame her former servicer for errors on her loan.

459.    Plaintiff was damaged by paying additional fees and interest that she would not otherwise have had to pay if payments were correctly applied.

460.     Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over what her true unpaid principal balance on her loan actually was and whether her loan was being properly serviced.

461.     Plaintiff was damaged by paying additional interest and fees that would not have been charged if her payments were correctly applied.

462.     No updated Payoff Quote was mailed to Plaintiff until September 13, 2019.

463.     Defendant Mr. Cooper's June Response violated RESPA by failing and refusing to provide the updated Payoff Quote that it said it would until approximately three months later.

464.     Plaintiff was damaged by not knowing how Defendant Mr. Cooper corrected her payment history, how much she would have to pay to reinstate the Mortgage, or an accurate payoff amount.

465.     Defendant Mr. Cooper's June Response violated RESPA by stating that "due to the delinquent status of the account at the time of transfer installments would not be accepted," which is erroneous and misleading.

466.     Upon information and belief, if Mr. Cooper had corrected the account ledger to show payments current through August of 2018 then correctly applied the payments made by Plaintiff between September 2018 and February of 2019, the Mortgage would have been current on the date of transfer.

467.     Upon information and belief, the Servicing Guidelines would have required Defendant Mr. Cooper to accept Plaintiff's payments if the account ledger had been corrected because any delinquency would have been less than an amount that would trigger turning the Mortgage over to Mr. Cooper's attorneys for foreclosure.

468.     Upon information and belief, Defendant Mr. Cooper engages in a pattern and practice of failing to notice and/or refund overcharges on loans it services.

469.     Mr. Cooper's policy of failing to notice and/or refund overcharges is a pattern or practice of violating RESPA.

470.     Plaintiff was damaged by having her Mortgage turned over to Defendant Mr. Cooper's attorneys for foreclosure when she was either not in default or only owed a small delinquency figure.

471.     Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over whether the Property was going to be

42

foreclosed upon and how much she actually owed to reinstate the Mortgage or cure any arrearage thereon.

472.    Paragraph five stated that Mr. Cooper agreed escrow advances were not repaid.

473.    The error alleged in the May NOE #2 was that the three (3) escrow advances were not repaid *to Plaintiff* not to Mr. Cooper.

474.    Defendant Mr. Cooper's June Response violated RESPA by failing to respond to the actual inquiry as to escrow advances that should have been repaid or refunded to the Plaintiff.

475.    Upon information and belief, if loan payments were correctly applied, there would be no escrow advances by Seterus that transferred to Mr. Cooper because funds paid by Plaintiff were sufficient and available to cover the same.

476.    Upon information and belief, if loan payments were correctly applied, there would be no escrow advances by Mr. Cooper because funds paid by Plaintiff were sufficient and available to cover the same.

477.    Upon information and belief, Mr. Cooper had no basis for advancing $6.00 for hazard insurance on May 1, 2019.

478.    Defendant Mr. Cooper's June Response violated RESPA by failing to correctly apply the payments and thus failed to correct the escrow advances shown on the account ledger.

479.    Plaintiff was damaged by paying additional fees and interest that she would not otherwise have had to pay if payments were correctly applied.

480.    Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over what her true unpaid principal balance on her loan actually was and whether her loan was being properly serviced.

481.    Concerning the property inspections, Mr. Cooper stated that a total of $211.00 was assessed on the account but that the adjustment of the ten (10) installment payments would cause their bankruptcy team to review the same and determine if they were valid.

482.    Property inspection fees were $15.00 each under Defendant Seterus.

43

483.    Property inspection fees were $12.00 or $14.00 each under Defendant Mr. Cooper.

484.    Defendant Mr. Cooper's June Response violated RESPA by failing to credit Plaintiff's account for all property inspection fees that were assessed when the Loan was not delinquent.

485.    Plaintiff was damaged by having to pay an inflated payoff figure as alleged in payoff statements dated after the June Response, in subsequent responses to NOEs, in the Foreclosure Affidavit, and in the Proof of Claim.

486.    Plaintiff was damaged by paying additional fees and interest that she would not have had to pay if the property inspection fees had been corrected on her Mortgage.

487.    Defendant Mr. Cooper's June Response RESPA violation of failing to correct the account ledger concerning the funds of $150.68 being unapplied and in suspense because they were not enough to cover a full monthly installment is erroneous and misleading.

488.    If Mr. Cooper had corrected the account ledger and correctly applied payments made by Plaintiff, the unapplied funds figure would be different, and some unapplied funds would have been applied to reduce the total balance owed on the Mortgage.

489.    Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over what her true unpaid principal balance on her loan actually was and whether her loan was being properly serviced.

490.    The June Response admitted that there was an error "by the previous servicer."

491.    Defendant Mr. Cooper's June Response violated RESPA by its failure to admit the errors made by Defendant Mr. Cooper as set forth in the May NOEs.

492.    Plaintiff was damaged by receiving inaccurate and misleading information that caused her confusion and anxiety over what the true balance on her loan actually was and whether her loan was being properly serviced.

### C.    Plaintiff's September RFI and Defendant Mr. Cooper's Response

493.    On September 4, 2019, Plaintiff wrote an RFI under 12 U.S.C. § 2605(e) to Mr. Cooper (the "September RFI") requesting a copy of the servicing file, life of loan history, and

44

current payoff. A copy of the September RFI is attached hereto and incorporated herein as "Exhibit EEE."

494. On September 13, 2019, Mr. Cooper responded to the September RFI (the "September Response"). A copy of the September Response is attached hereto and incorporated herein as "Exhibit FFF."

495. On page three (3) of the September Response, it stated, "as of the date of this correspondence, the account is approximately five (5) installments in arrears and next due for May 1, 2019, monthly installment" (the "Current through May Admission").

496. Defendant Mr. Cooper's September Response violated RESPA by refusing to recognize its error and admit that the Mortgage was either current or close to current on March 1, 2019 when it was transferred to Defendant Mr. Cooper.

497. Defendant Mr. Cooper's September Response violated RESPA by refusing to recognize its error and admit that it should have accepted payments from Plaintiff.

498. Defendant Mr. Cooper's September Response violated RESPA by refusing to recognize its error and admit that it would not have had a legal basis to initiate the foreclosure action.

499. Plaintiff was damaged by the failure of Defendant Mr. Cooper to accept and credit Mortgage payments, which caused Defendant Mr. Cooper to turn the Mortgage over to its attorneys for foreclosure.

500. Plaintiff was damaged by worrying about losing the Property through foreclosure.

501. Plaintiff was damaged by paying additional fees and interest that she would not have had to pay if the Mortgage had not been turned over to Defendant Mr. Cooper's attorneys for foreclosure.

502. Plaintiff was damaged by receiving this inaccurate and misleading information by causing Plaintiff anger, confusion and anxiety over when her Mortgage had been current and worry over whether her loan was being properly serviced.

**D.      Plaintiff's FPI NOE and Mr. Cooper's Responses**

503. 12 U.S.C. § 2605 governs the servicing of mortgage loans and administration of escrow accounts.

504. 12 U.S.C. § 2605(k)-(m) pertain to when a servicer may force place insurance on a loan.

45

505.    12 U.S.C. § 2605(k)(1)(A) prohibits a servicer from force placing insurance "unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance."

506.    12 U.S.C. § 2605(k)(2) defines force placed insurance as "hazard insurance coverage obtained by a servicer of a federally related mortgage when the borrower has failed to maintain or renew hazard insurance on such property as required of the borrower under the terms of the mortgage."

507.    When Defendant Mr. Cooper force placed insurance on the Loan, it did so in violation of 12 U.S.C. § 2605(k)-(l).

508.    12 C.F.R. § 1024.17 governs escrow accounts.

509.    12 C.F.R. § 1024.17(k)(5)(i), which applies to borrowers with mortgage payments more than 30 days overdue and who have an escrow account for the payment of hazard insurance, forbids a servicer to purchase force placed insurance unless the servicer is unable to disburse funds from the borrower's escrow account to ensure that the borrower's hazard insurance premium charges are paid in a timely manner.

510.    12 C.F.R. § 1024.17(k)(5)(ii) describes what happens if the servicer has an inability to disburse funds.  Neither applies to the Defendant Mr. Cooper.

511.    12 C.F.R. § 1024.17(k)(5)(ii)(A) provides that a servicer is unable to disburse funds from an escrow account to ensure timely payment of insurance premiums only if the servicer has a reasonable basis to believe that either the borrower's hazard insurance was cancelled or not renewed for a reason other than nonpayment of premiums or that the borrower's property is vacant.

512.    12 C.F.R. § 1024.17(k)(5)(ii)(B) provides that an inability **does not** exist just because an escrow account contains insufficient funds for paying hazard insurance premium charges.

513.    12 C.F.R. § 1024.17(k)(5)(ii)(C) allows the servicer to recoup any advances of funds to an escrow account to ensure the premiums are timely paid.

514.    On December 12, 2019 and October 1, 2020, Plaintiff wrote requests under 12 U.S.C. § 2605(e) to Defendant Mr. Cooper alleging servicing errors regarding the FPI (collectively the "FPI NOE").  A copy of the FPI NOE is attached hereto and incorporated by reference as "Exhibit GGG."

515.    The FPI NOE provided that the Property had not been foreclosed upon as Defendant Mr. Cooper told NC Grange.

516.    The FPI NOE stated that Defendant Mr. Cooper should never have force placed insurance on the Mortgage because a current HOI was in effect on the Property at the time Defendant Mr. Cooper erroneously told NC Grange that it had foreclosed.

46

517.    The FPI NOE calculated no less than six (6) actionable errors.

518.    Plaintiff received responses to the FPI NOE dated January 8, 2020 and October 9, 2020 (collectively the "FPI Response").  A copy of the FPI Response is attached hereto and incorporated herein, with duplicate attachments removed, as "Exhibit HHH."

519.    The FPI Response contained several erroneous or inconclusive statements.

520.    The FPI Response stated as follows:

A foreclosure sale took place on September 25, 2019, and the property was acquired and moved to Real Estate Owned (REO) on September 26, 2019.  As a result, and in accordance with the foreclosure process the insurance cancellation letter was generated on September 27, 2019.  However, we were notified that Chapter 13 Bankruptcy was filed during the North Carolina redemption period, September 27, 2019.  Therefore, due to the filing the foreclosure was rescinded and placed on hold.

521.    Under North Carolina law, a power of sale is terminated if, prior to the expiration of the upset bid period, payment is made of the obligation secured by the deed of trust and the expenses incurred with respect to the sale.  N.C.G.S. § 45-21.20.

522.    Furthermore, when a borrower files a bankruptcy case before the expiration of the 10-day upset bid period, the foreclosure sale is stayed pursuant to 11 U.S.C. §§ 105 and 362. N.C.G.S. § 45-21.22(c)-(d).

523.    According to Black's Law Dictionary, "rescind" means "(1) to abrogate or cancel a contract unilaterally or by agreement, or (2) to make void; to repeal or annul."  *Rescind*, *Black's Law Dictionary* (11th ed. 2019).

524.    Upon information and belief, "recission" is not a term discussed in any case law in North Carolina relating to the halting of a foreclosure action other than when the mortgage loan itself is rescinded, thus rendering a foreclosure ineffective.

525.    "Rescind" or "rescission" are equitable remedies in contract law in North Carolina.  *See, e.g.*, *Marshall v. Miller*, 276 S.E.2d 397, 302 N.C. 539 (N.C. 1981); *Brannock v. Fletcher*, 155 S.E.2d 532, 271 N.C. 65 (N.C. 1967).

526.    Defendant Mr. Cooper's FPI Response violated RESPA by providing inaccurate and misleading information about the status of the Foreclosure and the foreclosure process.

47

527.   Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error regarding the Foreclosure.

528.   Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error regarding the effect of the filing of a bankruptcy case at any time prior to the completion of a foreclosure action upon the expiration of the 10-day upset bid period by a debtor that has had one or no cases pending within the previous one-year period.

529.   Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error regarding the ownership status of the Property on September 26, 2019.

530.   Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error of sending insurance cancellation notices prior to the completion of a foreclosure proceeding.

531.   Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error of sending the Insurance Cancellation Notice regarding the Property.

532.   Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error and failing to correct the same by informing NC Grange that the Insurance Cancellation Letter was incorrect.

533.   Defendant Mr. Cooper's FPI Response violated RESPA by failing to correct the information to NC Grange as to ownership of the Property.

534.   Defendant Mr. Cooper's FPI Response violated RESPA by providing erroneous and inaccurate information about "acquiring" the Property and moving it to REO status while the foreclosure was still pending.

535.   Defendant Mr. Cooper's FPI Response violated RESPA by providing erroneous and inaccurate information as to what is considered "in accordance with the foreclosure process" as it relates to insurance cancellation letters.

536.   Defendant Mr. Cooper's FPI Response violated RESPA by not correcting the insurance cancellation letter with NC Grange.

537.   Defendant Mr. Cooper's FPI Response violated RESPA by providing erroneous and inaccurate information as to the foreclosure being rescinded at a time when it was not completed.

538.   Upon information and belief, Defendant Mr. Cooper engages in a pattern and practice of improperly force placing insurance.

48

539.    Mr. Cooper's policy of improper force-placement of insurance is a pattern or practice of violating RESPA.

540.    Plaintiff was damaged by receiving this inaccurate and misleading information by causing her confusion and anxiety over the status of the Foreclosure, her HOI, and worry over whether her loan was being property serviced.

541.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay for FPI.

542.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay an HOI premium more than $599.00 above what her NC Grange HOI premium was.

543.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay two monthly HOI premium payments during the months of January-December 2020.

544.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to have to pay higher HOI premiums in future years.

545.    The FPI Response contained the following paragraph:

On October 15, 2019, a cancellation notice was received from North Carolina Grange Mutual, effective September 26, 2019.  Please keep in mind that the foreclosure sale date took place September 25, 2019, and the property was acquired and moved to REO on September 26, 2019.  This was the effective date of the cancellation notice from North Carolina Grange Mutual.

546.    Defendant Mr. Cooper's FPI Response violated RESPA by failing and refusing to acknowledge that NC Grange cancelled the HOI Policy *because* Defendant Mr. Cooper erroneously informed it that it was the owner of the Property as of September 26, 2019.

547.    Defendant Mr. Cooper's FPI Response violated RESPA by providing erroneous and inaccurate information as to the ownership status of the Property.

548.    Defendant Mr. Cooper's FPI Response violated RESPA by failing to produce a copy of the Insurance Cancellation Letter to Plaintiff.

49

549.    Defendant Mr. Cooper's FPI Response violated RESPA by failing to reasonably investigate the status of ownership of the property after the Sale and whether it should have corrected the Notice of Insurance Cancellation it sent NC Grange.

550.    Plaintiff was damaged by Defendant Mr. Cooper's failure to provide a copy of the Insurance Cancellation Letter because it would have aided in the preparation of this Complaint. Now Plaintiff will have to seek the same through the discovery process and be without the same for several months.

551.    Plaintiff was damaged by Defendant Mr. Cooper's failure to provide a copy of the Insurance Cancellation Letter because the only remaining vehicle for obtaining the same was through filing a lawsuit against Defendant Mr. Cooper, which caused the Plaintiff to incur costs and attorney fees and to suffer from anxiety, stress, and the emotional toll being involved in litigation will bring.

552.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay two monthly HOI premium payments during the months of January-December 2020.

553.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to have to pay higher HOI premiums in future years.

554.    The FPI Response contained the following paragraphs:

Mr. Cooper adequately requested to provide evidence of insurance coverage on October 16, 2019, and [the] we sent a second and final notice on November 15, 2019.   Since we did not receive proof of insurance we issued a letter dated December 23, 2019, confirming Mr. Cooper obtained hazard insurance on the property to protect our interest in the property.

In order to remove the force placed insurance your client will need to contact the previous insurance carrier/agent to include the account number and property address above on a copy of the new/renewal policy or notice of reinstatement and fax it with a Mortgage Clause/Lender's Loss Payable Endorsement as soon as possible to [address provided].

. . . It has been determined that there has been no wrongdoing as it pertains to the referenced account.  As such, we respectfully refute all allegations of violations, notice of errors, illegal foreclosure actions, and any other unfound claim mentioned in your letter.

50

555.    Defendant Mr. Cooper's FPI Response violated RESPA by continuing to refuse to recognize its errors and providing inaccurate and misleading information by claiming no wrongdoing was committed on Plaintiff's account.

556.    Defendant Mr. Cooper's FPI Response violated RESPA by failing to investigate whether its action in sending the Insurance Cancellation Letter was proper.

557.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay for FPI.

558.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay an HOI premium more than $599.00 above what her NC Grange HOI premium was.

559.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to pay two monthly HOI premium payments during the months of January-December 2020.

560.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by causing her to have to pay higher HOI premiums in future years.

561.    Plaintiff was damaged by Defendant Mr. Cooper's failure to correct its error issuing the insurance cancellation letter by having to file the current Adversary Proceeding, including the costs, anxiety, stress, and emotional toll that being involved in litigation will cause Plaintiff.

### E.    Plaintiff's Foreclosure NOE and Mr. Cooper's Response

562.    On October 5, 2020, Plaintiff wrote a request under 12 U.S.C. § 2605(e) to Defendant Mr. Cooper alleging servicing errors regarding the Prohibition on Foreclosure Referral (the "Foreclosure NOE").  A copy of the Foreclosure NOE is attached hereto and incorporated by reference as "Exhibit III."

563.    Under 12 C.F.R. § 1024.35(b)(9), it is a servicing error to make the first notice of filing required by applicable law for any foreclosure in violation of § 1024.41(f) or (j).

564.    Under Section 1024.41(f), a servicer shall not make the first notice or filing for any foreclosure process unless the borrower's mortgage loan obligation is more than 120 days delinquent.  12 C.F.R. § 1024.41(f)(1)(i).

51

565.    The Foreclosure NOE stated that the Mortgage was current through at least February 28, 2019 and that the Foreclosure action was filed on May 21, 2019 when the loan was less than 120 days delinquent.

566.    The Foreclosure NOE calculated no less than two (2) actionable errors.

567.    Plaintiff received a response to the Foreclosure NOE dated October 9, 2020 (the "Foreclosure Response").  A copy of the Foreclosure Response is attached hereto and incorporated herein, with duplicate attachments removed, as "Exhibit JJJ."

568.    The Foreclosure Response violated RESPA by completely failing to address the error pointed out by Plaintiff.

569.    Defendant Mr. Cooper's FPI Response violated RESPA by refusing to recognize its error.

570.    Defendant Mr. Cooper's FPI Response violated RESPA by failing and refusing to provide Plaintiff's Request for Information regarding the timing of the Foreclosure referral by stating that it already responded to this matter on January 8, 2020 and resubmitting a copy of the January 8, 2020 Response (the "January Response").  A copy of the January Response is attached hereto and incorporated herein as "Exhibit KKK."

571.    Plaintiff was damaged by not receiving the information because she could not verify any dates of potential default to be able to determine if Defendant Mr. Cooper was in compliance with the Servicing Guidelines and North Carolina foreclosure law.

572.    Defendant Mr. Cooper's January Response violated RESPA by refusing to recognize its error about the Property ownership status.

573.    Plaintiff was damaged by this erroneous information because she paid additional interest and default related fees that would have been negated if Mr. Cooper acknowledged the error.

574.    Plaintiff was damaged by this inaccurate information by causing the Plaintiff anger, confusion and anxiety over whether her Mortgage could have been foreclosed upon and whether her loan was being properly serviced.

**F.      Plaintiff's Payment History NOE and Mr. Cooper's Response**

575.    On October 13, 2020, Plaintiff wrote a request under 12 U.S.C. § 2605(e) to Defendant Mr. Cooper alleging servicing errors regarding the failure to produce a full loan payment history (the "Payment History NOE").  A copy of the Payment History NOE is attached hereto and incorporated herein as "Exhibit LLL."

576.    The Payment History NOE stated that the Foreclosure Response contained a loan payment history wherein the right column(s) of the document were cut off and not visible.

577.    The Payment History NOE calculated no less than twenty (20) actionable errors.

578.    Plaintiff received a response to the Payment History NOE dated October 29, 2020 (the "Payment History Response").  A copy of the Payment History Response is attached hereto and incorporated herein as "Exhibit MMM."

579.    The Payment History Response appeared to contain a full account payment history.

G.    **Seterus and Mr. Cooper History of Complaints**

580.    On December 18, 2020, the CFPB issued a consent order against Seterus for extensive and persistent violations of RESPA.  Information on this matter and a copy of the consent order can be found at https://www.consumerfinance.gov/enforcement/actions/seterus-inc/.

581.    On December 7, 2020, the CFPB and several states entered into a settlement agreement with Nationstar Mortgage for unlawful servicing practices.  A copy of the complaint and proposed judgment can be found at https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-multiple-states-enter-settlement-nationstar-mortgage-llc-unlawful-servicing-practices/.

582.    Between December 1, 2011 and December 7, 2020, consumers filed 4,488 complaints with the CFPB against Seterus.  We should site to this – just put a citation to the website where you found these statistics, please.

583.    Of these 4,488 complaints, the primary issue of 3,260 complaints related to loan servicing, escrow payments, loan modification, loan collection, or foreclosure.

584.    Between December 1, 2011 and December 7, 2020, consumers filed 22,974 complaints with the CFPB against Nationstar Mortgage.

585.    Of these 22,974 complaints, the primary issue of 17,085 complaints related to loan servicing, escrow payments, loan modification, loan collection, foreclosure, or trouble during the payment process.

586.    Upon information and belief, Mr. Cooper is solely identified as Nationstar Mortgage in the CFPB Consumer Complaint Database.

53

587.    Seterus and Mr. Cooper have a well documented torrid history of repeatedly violating homeowner's rights and improperly servicing mortgage loans.

588.    Seterus and Mr. Cooper have engaged in a pattern and practice of committing servicing errors on Plaintiff's Loan as well as on thousands of other mortgage loans.

### H.    RESPA Damages

589.    Defendant Mr. Cooper, by failing to accurately respond to Plaintiff's Notices of Error and Requests for Information in accordance with RESPA laws and regulations, is liable to Plaintiff for actual damages to be proven by competent evidence.  12 U.S.C. § 2605(f)(1)(A).

590.    Defendant Mr. Cooper, by failing to accurately respond to Plaintiff's Notices of Error and Requests for Information in accordance with RESPA laws and regulations, has demonstrated a pattern and practice of noncompliance with the requirements of RESPA, is liable to Plaintiff for actual damages in an amount not to exceed $2,000.00 per violation.  12 U.S.C. § 2605(f)(1)(B); *see Spencer v. Hutchens*, 471 F. Supp. 2d 548, 554 (M.D.N.C. 2006) ("Section 2605(f) provides that *for a violation of the statute*, an individual may recover actual damages and additional damages not to exceed $1,000 should the Court find a pattern or practice of noncompliance . . . .") (emphasis added); *see also Ranger v. Wells Fargo Bank N.A.*, 757 Fed. Appx. 896, 901 n.2 (11th Cir. 2018) ("Borrowers may also recover statutory damages of up to $2,000 per violation . . . .); *Fowler v. Bank of Am., Corp.*, 747 Fed. Appx. 666, 669 (10th Cir. 2018) ("But borrowers may recover statutory damages of up to $2,000 per violation . . . .").

591.    Defendant Mr. Cooper, by failing to accurately respond to Plaintiff's Notices of Error and Requests for Information in accordance with RESPA laws and regulations, is liable to Plaintiff for the costs of this action, together with any attorney's fees incurred in connection with this action as this Court may determine to be reasonable under the circumstances.  12 U.S.C. § 2605(f)(3).

### COUNT FIVE
### VICARIOUS LIABILITY/AGENCY OF DEFENDANT FANNIE MAE

592.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

593.    Fannie Mae is the master servicer of the Mortgage.

594.    Under the terms of its Servicing Agreement with Seterus, Fannie Mae acknowledged that Seterus will act on Fannie Mae's behalf.

595.    Under the terms of its Servicing Agreement with Mr. Cooper, Fannie Mae acknowledged that Mr. Cooper will act on Fannie Mae's behalf.

596.    Under the terms of its Servicing Guidelines, Fannie Mae acknowledged that Seterus will act on Fannie Mae's behalf.

597.    Under the terms of its Servicing Guidelines, Fannie Mae acknowledged that Mr. Cooper will act on Fannie Mae's behalf.

598.    Under the terms of its Servicing Agreement with Fannie Mae, Seterus agreed to act on Fannie Mae's behalf.

599.    Under the terms of its Servicing Agreement with Fannie Mae, Mr. Cooper agreed to act on Fannie Mae's behalf.

600.    By agreeing to the terms of the Servicing Guidelines, Seterus agreed to act on Fannie Mae's behalf.

601.    By agreeing to the terms of the Servicing Guidelines, Mr. Cooper agreed to act on Fannie602e's behalf.

602.    Upon information and belief, Defendant Fannie Mae has considerable control over Defendants Seterus and Mr. Cooper by virtue of a Servicing Agreement that governs their relationship.

603.    Upon information and belief, the Servicing Agreements between Fannie Mae and Defendants Seterus and Mr. Cooper contain specific details and guidelines that Seterus and Mr. Cooper must follow.

604.    Upon information and belief, one of the very specific functions the Servicing Agreement was designed to cover was Defendants Seterus and Mr. Cooper's responding to requests for information, notices of error, and requests for payoff statements.

605.    Upon information and belief, Defendant Fannie Mae has considerable control over Defendants Seterus and Mr. Cooper by virtue of the Servicing Guidelines that governs their relationship.

606.    Upon information and belief, without limitation, very specific functions the Servicing Guidelines were designed to cover include the acceptance and application of payments, escrow accounts, default mitigation requirements, foreclosure prerequisites and requirements, and the assessment of fees to accounts.

607.    Upon information and belief, under the terms of the Servicing Agreement between Fannie Mae and Seterus, Fannie Mae controls the means and details the process by which Seterus is to service its loans.

608.    Upon information and belief, under the terms of the Servicing Agreement between Fannie Mae and Mr. Cooper, Fannie Mae controls the means and details the process by which Mr. Cooper is to service its loans.

609.    Upon information and belief, under the terms of the Servicing Guidelines, Fannie Mae controls the means and details the process by which Seterus is to service its loans.

610.    Upon information and belief, under the terms of the Servicing Guidelines, Fannie Mae controls the means and details the process by which Mr. Cooper is to service its loans.

611.    Upon information and belief, Defendant Fannie Mae may terminate Seterus' employment at any time.

612.    Upon information and belief, Defendant Fannie Mae may terminate Mr. Coopers' employment at any time.

613.    As its servicer, Seterus is an employee and agent of Defendant Fannie Mae.

614.    As its servicer, Mr. Cooper is an employee and agent of Defendant Fannie Mae.

615.    Defendant Seterus has express or implied authority to act on behalf of Defendant Fannie Mae.

616.    Defendant Mr. Cooper has express or implied authority to act on behalf of Defendant Fannie Mae.

617.    Fannie Mae controls the actions of Defendants Seterus and Mr. Cooper as it concerns the servicing of Fannie Mae's loans.

618.    Fannie Mae controlled the actions of Defendants Seterus and Mr. Cooper as it concerns the servicing of the Mortgage.

619.    Under North Carolina law, Seterus is an agent of the Fannie Mae.

620.    Under North Carolina law, Mr. Cooper is an agent of the Fannie Mae.

621.    Fannie Mae filed the Proof of Claim in the Prior Case for the Mortgage debt.

622.    Mr. Cooper filed the Proof of Claim in the Current Case for the Mortgage debt.

623.    Defendant Fannie Mae is liable for violations of Defendants Seterus and Mr. Cooper for their servicing violations on the Mortgage.

624.    At all times, Seterus was acting within the scope of its authority to act for Fannie Mae.

56

625.    At all times, Mr. Cooper was acting within the scope of its authority to act for Fannie Mae.

626.    Plaintiff has been damaged by the conduct of both Seterus and Mr. Cooper, and Fannie Mae, as principal and employer, is liable for actual damages and attorney's fees and costs as deemed appropriate by this Court.

## COUNT SIX
## OBJECTION TO PROOF OF CLAIM
### 11 U.S.C. §§ 105, 501 and 502, Federal Rules of Bankruptcy Procedure 3001, 3002 and 3007

627.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

628.    Defendant Mr. Cooper filed the Current Case Proof of Claim pursuant to 11 U.S.C. § 501(a).

629.    A proof of claim filed under 11 U.S.C. § 501(a) is deemed allowed in the absence of an objection thereto pursuant to 11 U.S.C. § 502.

630.    18 U.S.C. § 152(4) prohibits the filing of a false proof of claim and makes it a criminal act to do so.

631.    Filing a false proof of claim in contravention of Section 501 and Federal Bankruptcy Rule 3001 constitutes an abuse of the bankruptcy process.

632.    A bankruptcy court may exercise its equitable powers and invoke its statutory contempt power under 11 U.S.C. § 105 to facilitate other provisions of the Bankruptcy Code.

633.    Upon information and belief, the Current Case Proof of Claim is incorrect on multiple relevant factors, including but not limited to the total amount owed, the arrearage owed, escrow deficiency, and projected escrow shortage.

634.    Upon information and belief, the account ledger attached to the Current Case Proof of Claim is incorrect.

635.    During its investigation of the RFIs and NOEs outlined herein above, Defendant Mr. Cooper should have realized that the figures on the Current Case Proof of Claim were erroneous and should have taken measures to correct the same.

636.    Payments made by Plaintiff on the Mortgage in the Prior Case were improperly credited to the Mortgage by Seterus.

637.    Seterus should have corrected its misapplication of payments while it was servicing the Mortgage.

57

638.   Mr. Cooper should have corrected Seterus' misapplication of payments that matched the information Seterus filed in this Court.

639.   Failure of Seterus to credit payments correctly and Mr. Cooper to fix the same resulted in the inflated payoff figure listed on the Current Case Proof of Claim.

640.   Upon information and belief, the Notice of Mortgage Payment Change is incorrect as to the new escrow payment, or in the alternative, is correct but in a higher amount than it should be due to actions of Mr. Cooper.

641.   The increase to HOI premium on the Notice of Mortgage Payment Change, representing an increase of over 51% to the same, is due to Mr. Cooper's error in issuing the notice to NC Grange alleging that the Property was in REO status.

642.   The NC Grange Policy was cancelled because Mr. Cooper erroneously informed NC Grange that the Property was no longer owned by Plaintiff.

643.   During its investigation of the RFIs and NOEs outlined herein above, Defendant Mr. Cooper should have realized that the significant increase in cost for the HOI premium was its fault and made Plaintiff pay for the same.

644.   During its investigation of the RFIs and NOEs sent by Plaintiff, Defendant Mr. Cooper should have realized that the figures on the Proof of Claim were erroneous and should have taken measures to promptly correct the same.

645.   During its investigation of the RFIs and NOEs sent by Plaintiff, Defendant Mr. Cooper should have realized that the figures on the Notice of Mortgage Payment Change were erroneous and should have taken measures to promptly correct the same.

646.   The actions of the Defendant Mr. Cooper demonstrated a callous disregard for the accuracy of the Proof of Claim filed in this Court.

647.   Pursuant to 11 U.S.C. § 105(a), Plaintiff may recover from Defendant Mr. Cooper any actual damages suffered at the hands of the Defendant Mr. Cooper, civil penalties as deemed appropriate by the Court, as well as the payment of the Plaintiff's attorney's fees and costs.

## COUNT SEVEN
## VIOLATION OF NORTH CAROLINA LAW
### North Carolina General Statutes Chapter 45 Article 10

648.   The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

### A.   Misapplying Payments Under N.C.G.S. §§ 45-91(2) and (2a)

649.   The misapplication of payments is a violation of N.C.G.S. §§ 45-91(2) and (2a), which requires payments to be accepted and credited within one business day of the date received, or if not, written notice to the borrower within 10 business days as to why it was not credited.

58

650.    The notification provision in N.C.G.S. § 45-91(2) does not apply if the servicer applies the payments as required by bankruptcy laws, including under a bankruptcy plan.

651.    Defendant Seterus admitted it was misapplying payments to the Mortgage through its admissions in the Withdrawals of the Motions for Relief from Stay.

652.    Defendant Seterus was required to provide written notice to Plaintiff that it was not applying payments as required by N.C.G.S. §§ 45-91(2) and (2a).

653.    Defendant Seterus violated these provisions by misapplying the Plaintiff's payments during the Prior Case.

654.    Defendant Seterus violated these provisions by misapplying the Plaintiff's payments through its failure to correct the payment ledger to reflect that Plaintiff was current on payments on the dates set forth by Seterus in the Withdrawals of the Motions for Relief from Stay.

655.    Defendant Seterus violated these provisions by misapplying the payments Plaintiff made after the Withdrawals of the Motions for Relief from Stay.

656.    Defendant Seterus violated these provisions by misapplying the February Payment when it reversed the creditor for the same on February 12, 2019.

**B.    Requirement to Correct Errors Under N.C.G.S. § 45-93(3)**

657.    Under N.C.G.S. § 45-93(3), a servicer is required to "promptly correct errors relating to the allocation of payments, the statement of account, or the payoff balance identified in any notice from the borrower provided in accordance with subdivision (2) of this section, or discovered through the due diligence of the servicer or other means."

658.    Defendant Seterus violated these provisions by failing to correct the payment ledger to reflect that Plaintiff was current on payments on the dates set forth by Seterus in the Withdrawals of the Motions for Relief from Stay.

659.    Defendant Mr. Cooper violated these provisions by failing to correct the payment ledger to reflect that Plaintiff was current on payments on the dates set forth by Seterus in the Withdrawals of the Motions for Relief from Stay.

660.    Defendant Mr. Cooper violated these provisions by failing to correct the payment ledger to reflect that Plaintiff was current on payments on the date service was transferred to Mr. Cooper.

661.    Defendant Mr. Cooper violated these provisions by failing to correct the payoff balances provided in the RFIs until September 13, 2019.

662.    Defendant Mr. Cooper violated these provisions by failing to correct the payoff balance in the Affidavit of Default and other documents filed in the Foreclosure.

663.    Seterus' and Mr. Cooper's actions are believed to be a pattern and practice of behavior in conscious disregard for the Plaintiff's rights.

### C.    Assessment of Fees Under N.C.G.S. § 45-91(1)

664.    N.C.G.S. § 45-91(1)(a) requires any fee incurred by a servicer to be assessed within 45 days of the date the fee was incurred.

665.    N.C.G.S. § 45-91(1)(b) requires any fee incurred by a servicer to be explained clearly and conspicuously in a written statement mailed to borrower's last known address within 30 days after assessing the fee as long as such action does not violate the automatic stay and is not charged to the borrower's loan account.

666.    Failure to abide by N.C.G.S. § 45-91(1)(a)-(b) requires any fee incurred by a servicer to be waived.

667.    Under N.C.G.S. § 45-91(4), all fees charged by a servicer must be otherwise permitted under applicable law.

668.    Defendant Seterus violated these provisions by assessing property inspection fees of $15.00 each for the months of August 2018, September 2018 and October 2018 that were not permitted under the Loan Documents or applicable law.

669.    Defendant Seterus or Mr. Cooper (dates of the fees were not provided in the May Fee Response) violated these provisions by assessing the following fees to the Mortgage that were not permitted under the Loan Documents or applicable law.

| $256.00 | Prior legal fees |
| $210.00 | Inspection |
| $71.85 | Prior servicer advance |
| $26.00 | Property insurance |
| $6.00 | Fire insurance |
| $570.46 | Escrow balance at time of transfer |

670.    Defendant Mr. Cooper violated these provisions by assessing the following fees to the Mortgage that were not permitted under the Loan Documents or applicable law:

| 03/20/2019 | $75.00 | FC Fee |
| 04/15/2019 | $12.00 | Property Inspection |
| 04/16/2019 | $12.76 | Late Charges |
| 04/24/2019 | $14.00 | Property Inspection |
| 05/20/2019 | $300.00 | Filing Costs |
| 05/20/2019 | $60.00 | Sheriff Costs |
| 05/21/2019 | $937.50 | FC Fee |
| 05/26/2019 | $11.20 | Certified Mail |
| 06/06/2019 | $225.00 | Title Examinte [sic] |
| 06/20/2019 | $14.00 | Property Inspection |
| 07/10/2019 | $693.75 | FC Fee |
| 07/24/2019 | $14.00 | Property Inspection |

60

| 07/31/2019 | $450.00 | Publication |
| 08/20/2019 | $14.00 | Property Inspection |

671.    Defendants Seterus and Mr. Cooper violated the provisions of N.C.G.S. § 45-91(1)(b) by failing to provide the written statements regarding the assessment of these fees to Plaintiff.

**D.      Remedies For Violations of N.C.G.S. Chapter 45 Article 10**

672.    Plaintiff suffered actual damages from the violations of N.C.G.S. §§ 45-91(2), (2a), and 45-93 by Defendants Seterus and Mr. Cooper including but not limited to default related fees being added to the Mortgage when payments were not in default, interest that accrued on the Mortgage due to the addition of such fees, attorney's fees, and emotional distress.

673.    As a result of Seterus' and Mr. Cooper's actions, Defendants Seterus and Mr. Cooper are liable to Plaintiff for equitable or other remedies, actual damages, costs, and attorney's fees.

**COUNT EIGHT
BREACH OF CONTRACT**

674.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

675.    The Note is a valid contract.

676.    The Loan Modification Agreement is a valid contract.

677.    Paragraph 6 of the Loan Modification provides the following:

a.      Lender may assess a late charge for overdue payments if a payment is not received by the end of the fifteenth calendar day after the date it is due;

b.      That default means that borrower did not pay the full amount of each monthly payment on the date it was due; and

c.      That lender has the right to be paid back by borrower all of its costs and expenses in enforcing the Note if the borrower is in default.

678.    Defendant Seterus breached the terms of the Loan Modification by assessing late fees to the Mortgage on multiple occasions when payment was received by the end of the fifteenth calendar day after the date it was due.

679.    Defendant Mr. Cooper breached the terms of the Loan Modification by assessing late fees to the Mortgage on multiple occasions when payment was received by the end of the fifteenth calendar day after the date it was due.

680.    Defendant Seterus breached the terms of the Loan Modification by deeming the Mortgage in default on multiple occasions when Plaintiff paid the full amount of each monthly payment on the date it was due.

681.    Defendant Mr. Cooper breached the terms of the Loan Modification by deeming the Mortgage in default on multiple occasions when Plaintiff paid the full amount of each monthly payment on the date it was due.

682.    Defendant Seterus breached the terms of the Loan Modification by charging Plaintiff for costs and expenses it incurred to enforce the Note when Plaintiff was not in default.

683.    Defendant Mr. Cooper breached the terms of the Loan Modification by charging Plaintiff for costs and expenses it incurred to enforce the Note when Plaintiff was not in default.

684.    The Deed of Trust is a valid contract.

685.    The Deed of Trust required the lender to deem payments received when they are received in the location designated by the Lender.

686.    Defendant Mr. Cooper breached the terms of the Deed of Trust by failing to deem payments received that were received or scheduled to be received via AutoPay.

687.    The Deed of Trust required the lender to apply payments to each Periodic Payment in the order in which it became due.

688.    Defendant Seterus breached the terms of the Deed of Trust by applying payments to incorrect dates or incorrect Periodic Payment due dates.

689.    Defendant Mr. Cooper breached the terms of the Deed of Trust by applying payments to incorrect dates or incorrect Periodic Payment due dates.

690.    Uniform Covenant 2 of the Deed of Trust required the lender to apply any remaining payment amounts to late charges, next to any other amounts due under the Deed of Trust, and finally to reduce the principal balance.

691.    Defendant Seterus breached the terms of the Deed of Trust by applying payments in a manner inconsistent with the order set forth in Uniform Covenant 2.

692.    Defendant Mr. Cooper breached the terms of the Deed of Trust by applying payments in a manner inconsistent with the order set forth in Uniform Covenant 2.

693.    Defendant Mr. Cooper breached the terms of the Deed of Trust by refusing to accept payment when Plaintiff was current on the Mortgage.

694.    Uniform Covenant 2 of the Deed of Trust required Plaintiff to pay Lender Funds to pay for property taxes and HOI premiums.

695.    Plaintiff paid the Lender Funds to pay for property taxes and HOI premiums.

696.    Uniform Covenant 5 of the Deed of Trust provided that Lender could obtain insurance coverage at Plaintiff's expense only if Plaintiff failed to maintain the required coverage.

697.    Plaintiff never failed to maintain the HOI coverage required by Defendants.

62

698. Defendant Mr. Cooper breached Uniform Covenant 5 of the Deed of Trust by obtaining the FPI and charging Plaintiff for the same.

699. Paragraph 6 of the Note provided that a late charge may be assessed when the Note Holder had not received the full amount of any monthly payment by the end of fifteen calendar days after it was due.

700. Paragraph 6(b) of the Note defines default as not paying the full amount of each monthly payment on the date it is due.

701. Uniform Covenant 14 of the Deed of Trust allowed the Lender to charge Borrower fees for services performed in connection with default.

702. Default is a condition precedent to Lender being authorized to charge Borrower for the same.

703. Defendant Seterus breached the Note and Uniform Covenant 14 of the Deed of Trust by charging Plaintiff fees for services performed when she was not fifteen calendar days past a payment's due date.

704. Defendant Mr. Cooper breached the Note and Uniform Covenant 14 of the Deed of Trust by charging Plaintiff fees for services performed when she was not fifteen calendar days past a payment's due date.

705. Paragraph 9 of the Deed of Trust allows the Lender to protect its rights and interest in the property *if* borrower fails to perform the covenants and agreements in the Security Agreement.

706. Plaintiff did not fail to perform the covenants and agreements contained in the Security Agreement regarding maintaining insurance on the Real Property.

707. Plaintiff did not fail to perform the covenants and agreements contained in the Security Agreement regarding paying payments when due.

708. Mr. Cooper breached Paragraph 9 of the Deed of Trust by force placing insurance.

709. Mr. Cooper breached Paragraph 9 of the Deed of Trust by charging Plaintiff for the FPI.

710. Seterus breached Paragraph 9 of the Deed of Trust by assessing default related fees on the Mortgage.

711. Mr. Cooper breached Paragraph 9 of the Deed of Trust by assessing default related fees on the Mortgage.

712. The AutoPay Agreement is a valid contract.

713.    Upon information and belief, the AutoPay Agreement provided that Defendant Seterus would withdrawal the monthly mortgage payment from Plaintiff's bank account on a certain date each month.

714.    When Mr. Cooper became the servicer of the Loan, Mr. Cooper became obligated under the AutoPay Agreement.

715.    Upon information and belief, Mr. Cooper breached the terms of the AutoPay Agreement by failing to draft the payments from Plaintiff's bank account.

716.    Non-Uniform Covenant number twenty-two provided that default is a prerequisite for Lender to invoke the power of sale.

717.    On the date Mr. Cooper referred the Loan to foreclosure, Plaintiff was only in default for the March, April, and May 2019 payments because Mr. Cooper refused to honor the AutoPay Agreement or otherwise accept her payment.

718.    Plaintiff suffered actual damages from the breaches of contract by Defendants Seterus and Mr. Cooper including but not limited to fees added to the Mortgage, increased interest accruing on the Loan, an inflated payoff figure, increased HOI premiums, attorney's fees, and emotional distress.

719.    As a result of Defendants Seterus' and Mr. Cooper's actions, said Defendants are liable to Plaintiff for actual damages and consequential damages.

## COUNT NINE
## TORTIOUS INTERFERENCE WITH CONTRACT

720.    The allegations contained in the above paragraphs are hereby reincorporated herein by reference.

721.    The NC Grange Policy was a contract between Plaintiff and NC Grange.

722.    The NC Grange Policy conferred Plaintiff a contractual right to certain levels of insurance protection for her home and her liability in the home.

723.    Mr. Cooper knew about the NC Grange Policy.

724.    Mr. Cooper intentionally sent the Insurance Cancellation Letter to NC Grange misinforming it that Mr. Cooper had foreclosed on the Property.

725.    Mr. Cooper intended for NC Grange to cancel the NC Grange Policy.

726.    Based on the misinformation from Mr. Cooper about the ownership of the Property, NC Grange cancelled the NC Grange Policy.

727.    Mr. Cooper acted without justification when it informed NC Grange that it was the owner of the Property.

728.    Mr. Cooper's actions resulted in actual damage to the Plaintiff.

729.    Mr. Cooper's actions resulted in Plaintiff's HOI being cancelled prior to the end of its term.

730.    Mr. Cooper's actions caused the Property to be uninsured for several months.

731.    Mr. Cooper's actions caused the Plaintiff to be unable to get a replacement policy at a premium similar to the premium with NC Grange.

732.    Mr. Cooper's actions caused Plaintiff to have to pay an additional $808.11 for HOI for 2019-2020.

733.    Mr. Cooper's actions caused Plaintiff to have to pay interest on the amount of the premium she had to finance at a 22.17% interest rate.

734.    Mr. Cooper's actions caused Plaintiff to have to pay $117.27 per month out of pocket for ten (10) months of 2020, during which time she was also paying for HOI through an escrow component in her mortgage payments.

735.    Mr. Cooper's actions will cause Plaintiff to have to pay an additional $698.00 for HOI for 2020-2021.

736.    Mr. Cooper's actions will continue to cause Plaintiff to have to pay significantly more for HOI in future years.

737.    Plaintiff suffered actual damages from Mr. Cooper's tortious interference with her NC Grange Policy.

738.    Mr. Cooper exhibited a reckless and wanton disregard for Plaintiff's rights under the NC Grange Policy when it informed NC Grange that Plaintiff no longer owned property that she in fact owned then failed to correct its misinformation with NC Grange when informed of its mistake.

739.    As a result of Defendant Mr. Cooper's actions, Mr. Cooper is liable to Plaintiff for actual and punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Determine that the Defendants Seterus and Mr. Cooper's actions were in violation of 11 U.S.C. § 362(k)(1) and allow Plaintiff to recover actual damages incurred or to be incurred as a consequence of Defendants Seterus and Mr. Cooper's willful violations of the automatic stay, including but not limited to costs and attorney's fees;

2.    Determine that the Defendants Seterus and Mr. Cooper's actions were in violation of 11 U.S.C. § 362(k)(1) and allow Plaintiff to recover actual damages incurred or to be incurred as a consequence of Defendants Seterus and Mr. Cooper's willful violations of the automatic stay, including punitive damages;

3.    Determine that the Defendants Seterus and Mr. Cooper's actions were in violation of 11 U.S.C. § 524(a)(2) and allow Plaintiff to recover actual damages incurred or to be incurred

65

as a consequence of Defendants Seterus and Mr. Cooper's willful violations of the discharge injunction, including but not limited to costs and attorney's fees;

4.      Determine that the Defendants Seterus and Mr. Cooper's actions were in willful violation of 11 U.S.C. § 524(a)(2) and find them in contempt;

5.      Determine that the Plaintiff is entitled to monetary sanctions against Defendants Seterus and Mr. Cooper for their contempt including but not limited to costs, attorney's fees, and civil penalties;

6.      Determine that Defendants Seterus and Mr. Cooper were in violation of the FDCPA and allow Plaintiff to recover actual damages under 15 U.S.C. § 1692k(a)(1) incurred or to be incurred as a consequence of Seterus and Mr. Cooper's violations of the FDCPA;

7.      Determine that Defendants Seterus and Mr. Cooper were in violation of the FDCPA and allow Plaintiff to recover statutory damages under 15 U.S.C. § 1692k(a)(2) against Seterus and Mr. Cooper for their violations of the FDCPA;

8.      Determine that Defendants Seterus and Mr. Cooper were in violation of the FDCPA and allow Plaintiff to be awarded costs and attorney's fees under 15 U.S.C. § 1692k(a)(3) against Seterus and Mr. Cooper for their violations of the FDCPA;

9.      Award Plaintiff actual damages in an amount to be proven at trial pursuant to 15 U.S.C. § 1692k(a)(1) for violations of RESPA committed by Defendants Seterus and Mr. Cooper pursuant to 12 U.S.C. § 2605(f)(1)(B);

10.     Award Plaintiff statutory damages up to $2,000.00 pursuant to 15 U.S.C. § 1692k(a)(2) for each violation of RESPA committed by Defendants Seterus and Mr. Cooper pursuant to 12 U.S.C. § 2605(f)(1)(B);

11.     Award Plaintiff costs and attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3) for violations of RESPA committed by Defendants Seterus and Mr. Cooper pursuant to 12 U.S.C. § 2605(f)(1)(B);

12.     Award Plaintiff the costs of this action, together with any attorney's fees as the court may determine to be reasonable under the circumstances pursuant to 12 U.S.C. § 2605(f)(3);

13.     Determine that Fannie Mae is liable for the mortgage servicing errors of Seterus and Mr. Cooper and award Plaintiff actual damages, statutory damages, and costs and attorney's fees against Fannie Mae for violations of its agents;

14.     Determine that Defendants Seterus and Mr. Cooper's actions constituted breaches of contract under North Carolina law and allow Plaintiff to recover actual damages incurred or to

be incurred as a consequence of Seterus and Mr. Cooper's breaches of contract, including but not limited to costs and attorney's fees;

15. Determine that Defendants Seterus and Mr. Cooper's actions were in violation of 11 U.S.C. §§ 105, 501, and 502 and disallow the Proof of Claim filed by Mr. Cooper or determine the appropriate amount of the same;

16. Determine that Defendants Seterus and Mr. Cooper's actions were in violation of 11 U.S.C. §§ 105, 501, and 502 and allow Plaintiff to recover actual damages incurred or to be incurred as a consequence of Seterus and Mr. Cooper's contempt, including but not limited to costs, attorney's fees, and civil penalties;

17. Determine that Defendants Seterus and Mr. Cooper's actions were in violation of 12 C.F.R. §§ 1024.35(b)(1), (b)(2), (b)(3), (b)(4), (b)(5), (b)(6), and (b)(11) and allow Plaintiff to recover actual damages incurred or to be incurred as a consequence of Seterus and Mr. Cooper's violations, including but not limited to costs, attorney's fees, and statutory damages;

18. Determine that Defendants Seterus and Mr. Cooper's actions were in violation of N.C.G.S. §§ 45-91(2), (2a), and 45-93 and allow Plaintiff to recover actual damages incurred or to be incurred as a consequence of Seterus and Mr. Cooper's violations, including but not limited to costs and attorney's fees;

19. Determine that Defendant Mr. Cooper tortiously interfered with the NC Grange Policy between Plaintiff and NC Grange and allow Plaintiff to recover actual damages incurred or to be incurred as a consequence of Mr. Cooper's interference, including but not limited to costs and attorney's fees;

20. Allow Plaintiff to recover punitive damages as a result of Mr. Cooper's interference between Plaintiff and NC Grange on the NC Grange Policy;

21. Award such other and further relief as is just and proper.

This the 22nd day of December, 2020.

*/s/ Kristen S. Nardone*
KRISTEN S. NARDONE
NC Bar No. 28063
Attorney for Plaintiff

OF COUNSEL:

Nardone Law Firm
PO Box 1394
Concord, NC 28026-1394
(704) 784-9440
kristen@nardonelawfirm.com

67